POWELL ET AL. *v.* McCORMACK, SPEAKER OF
THE HOUSE OF REPRESENTATIVES, ET AL.

No. 138.   Argued April 21, 1969.—
Decided June 16, 1969.

*Arthur Kinoy* and *Herbert O. Reid* argued the cause for petitioners. With them on the brief were *Robert L. Carter, Hubert T. Delany, William Kunstler, Frank D. Reeves,* and *Henry R. Williams.*

*Bruce Bromley* argued the cause for respondents. With him on the brief were *John R. Hupper, Thomas D. Barr, Lloyd N. Cutler, John H. Pickering, Louis F. Oberdorfer,* and *Max O. Truitt, Jr.*

Briefs of *amici curiae* were filed by *Ernest Angell, Osmond K. Fraenkel, Edward J. Ennis, Melvin L. Wulf, Eleanor Holmes Norton,* and *Alan H. Levine* for the American Civil Liberties Union et al., and by *George Meader.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

In November 1966, petitioner Adam Clayton Powell, Jr., was duly elected from the 18th Congressional District of New York to serve in the United States House of Representatives for the 90th Congress. However, pursuant to a House resolution, he was not permitted to take his seat. Powell (and some of the voters of his district) then filed suit in Federal District Court, claiming that the House could exclude him only if it found he failed to meet the standing requirements of age, citizenship, and residence contained in Art. I, § 2, of the Constitution—requirements the House specifically found Powell met—and thus had excluded him unconstitutionally. The District Court dismissed petitioners' complaint "for want of jurisdiction of the subject matter." A panel of the Court of Appeals affirmed the dismissal, although on somewhat different grounds, each judge filing a separate opinion. We have determined that it was error to dismiss the complaint and that petitioner Powell is entitled to a declaratory judgment that he was unlawfully excluded from the 90th Congress.

I.

FACTS.

During the 89th Congress, a Special Subcommittee on Contracts of the Committee on House Administration conducted an investigation into the expenditures of the Committee on Education and Labor, of which petitioner

Adam Clayton Powell, Jr., was chairman. The Special Subcommittee issued a report concluding that Powell and certain staff employees had deceived the House authorities as to travel expenses. The report also indicated there was strong evidence that certain illegal salary payments had been made to Powell's wife at his direction. See H. R. Rep. No. 2349, 89th Cong., 2d Sess., 6–7 (1966). No formal action was taken during the 89th Congress. However, prior to the organization of the 90th Congress, the Democratic members-elect met in caucus and voted to remove Powell as chairman of the Committee on Education and Labor. See H. R. Rep. No. 27, 90th Cong., 1st Sess., 1–2 (1967).

When the 90th Congress met to organize in January 1967, Powell was asked to step aside while the oath was administered to the other members-elect. Following the administration of the oath to the remaining members, the House discussed the procedure to be followed in determining whether Powell was eligible to take his seat. After some debate, by a vote of 363 to 65 the House adopted House Resolution No. 1, which provided that the Speaker appoint a Select Committee to determine Powell's eligibility. 113 Cong. Rec. 26–27. Although the resolution prohibited Powell from taking his seat until the House acted on the Select Committee's report, it did provide that he should receive all the pay and allowances due a member during the period.

The Select Committee, composed of nine lawyer-members, issued an invitation to Powell to testify before the Committee. The invitation letter stated that the scope of the testimony and investigation would include Powell's qualifications as to age, citizenship, and residency; his involvement in a civil suit (in which he had been held in contempt); and "[m]atters of . . . alleged official misconduct since January 3, 1961." See Hearings on

H. R. Res. No. 1 before Select Committee Pursuant to H. R. Res. No. 1, 90th Cong., 1st Sess., 5 (1967) (hereinafter Hearings). Powell appeared at the Committee hearing held on February 8, 1967. After the Committee denied in part Powell's request that certain adversary-type procedures be followed,[1] Powell testified. He would, however, give information relating only to his age, citizenship, and residency; upon the advice of counsel, he refused to answer other questions.

On February 10, 1967, the Select Committee issued another invitation to Powell. In the letter, the Select Committee informed Powell that its responsibility under the House Resolution extended to determining not only whether he met the standing qualifications of Art. I, § 2, but also to "inquir[ing] into the question of whether you should be punished or expelled pursuant to the powers granted . . . the House under Article I, Section 5, . . . of the Constitution. In other words, the Select Committee is of the opinion that at the conclusion of the present inquiry, it has authority to report back to the House recommendations with respect to . . . seating, expulsion or other punishment." See Hearings 110. Powell did

---

[1] Powell requested that he be given (1) notice of the charges pending against him, including a bill of particulars as to any accuser; (2) the opportunity to confront any accuser, to attend all committee sessions where evidence was given, and the right to cross-examine all witnesses; (3) public hearings; (4) the right to have the Select Committee issue its process to summon witnesses for his defense; (5) and a transcript of every hearing. Hearings on H. R. Res. No. 1 before Select Committee Pursuant to H. R. Res. No. 1, 90th Cong., 1st Sess., 54 (1967).

The Select Committee noted that it had given Powell notice of the matters it would inquire into, that Powell had the right to attend all hearings (which would be public) with his counsel, and that the Committee would call witnesses upon Powell's written request and supply a transcript of the hearings. *Id.*, at 59.

not appear at the next hearing, held February 14, 1967. However, his attorneys were present, and they informed the Committee that Powell would not testify about matters other than his eligibility under the standing qualifications of Art. I, § 2. Powell's attorneys reasserted Powell's contention that the standing qualifications were the exclusive requirements for membership, and they further urged that punishment or expulsion was not possible until a member had been seated. See Hearings 111–113.

The Committee held one further hearing at which neither Powell nor his attorneys were present. Then, on February 23, 1967, the Committee issued its report, finding that Powell met the standing qualifications of Art. I, § 2. H. R. Rep. No. 27, 90th Cong., 1st Sess., 31 (1967). However, the Committee further reported that Powell had asserted an unwarranted privilege and immunity from the processes of the courts of New York; that he had wrongfully diverted House funds for the use of others and himself; and that he had made false reports on expenditures of foreign currency to the Committee on House Administration. *Id.,* at 31–32. The Committee recommended that Powell be sworn and seated as a member of the 90th Congress but that he be censured by the House, fined $40,000 and be deprived of his seniority. *Id.,* at 33.

The report was presented to the House on March 1, 1967, and the House debated the Select Committee's proposed resolution. At the conclusion of the debate, by a vote of 222 to 202 the House rejected a motion to bring the resolution to a vote. An amendment to the resolution was then offered; it called for the exclusion of Powell and a declaration that his seat was vacant. The Speaker ruled that a majority vote of the House would be sufficient to pass the resolution if it were so

amended. 113 Cong. Rec. 5020. After further debate, the amendment was adopted by a vote of 248 to 176. Then the House adopted by a vote of 307 to 116 House Resolution No. 278 in its amended form, thereby excluding Powell and directing that the Speaker notify the Governor of New York that the seat was vacant.

Powell and 13 voters of the 18th Congressional District of New York subsequently instituted this suit in the United States District Court for the District of Columbia. Five members of the House of Representatives were named as defendants individually and "as representatives of a class of citizens who are presently serving . . . as members of the House of Representatives." John W. McCormack was named in his official capacity as Speaker, and the Clerk of the House of Representatives, the Sergeant at Arms and the Doorkeeper were named individually and in their official capacities. The complaint alleged that House Resolution No. 278 violated the Constitution, specifically Art. I, § 2, cl. 1, because the resolution was inconsistent with the mandate that the members of the House shall be elected by the people of each State, and Art. I, § 2, cl. 2, which, petitioners alleged, sets forth the exclusive qualifications for membership.[2] The complaint further alleged that the Clerk of the House threatened to refuse to perform the service for Powell to which a duly elected Congressman is entitled, that the Sergeant at Arms refused to pay Powell his salary, and that the Doorkeeper threatened to deny Powell admission to the House chamber.

---

[2] The complaint also attacked the House Resolution as a bill of attainder, an *ex post facto* law, and as cruel and unusual punishment. Further, petitioners charged that the hearing procedures adopted by the Select Committee violated the Due Process Clause of the Fifth Amendment.

Petitioners asked that a three-judge court be convened.[3] Further, they requested that the District Court grant a permanent injunction restraining respondents from executing the House Resolution, and enjoining the Speaker from refusing to administer the oath, the Clerk from refusing to perform the duties due a Representative, the Sergeant at Arms from refusing to pay Powell his salary, and the Doorkeeper from refusing to admit Powell to the Chamber.[4] The complaint also requested a declaratory judgment that Powell's exclusion was unconstitutional.

The District Court granted respondents' motion to dismiss the complaint "for want of jurisdiction of the subject matter." *Powell* v. *McCormack,* 266 F. Supp. 354 (D. C. D. C. 1967).[5] The Court of Appeals for the District of Columbia Circuit affirmed on somewhat different grounds, with each judge of the panel filing a separate opinion. *Powell* v. *McCormack,* 129 U. S. App. D. C. 354, 395 F. 2d 577 (1968). We granted certiorari. 393 U. S. 949 (1968). While the case was pending on our docket, the 90th Congress officially terminated and the 91st Congress was seated. In November 1968, Powell was again elected as the representative of the 18th Congressional District of New York and he was seated by the 91st Congress. The resolution seating Powell also

---

[3] The District Court refused to convene a three-judge court and the Court of Appeals affirmed. Petitioners did not press this issue in their petition for writ of certiorari, apparently recognizing the validity of the Court of Appeals' ruling. See *Stamler* v. *Willis,* 393 U. S. 217 (1968).

[4] Petitioners also requested that a writ of mandamus issue ordering that the named officials perform the same acts.

[5] The District Court entered its order April 7, 1967, and a notice of appeal was filed the same day. On April 11, 1967, Powell was re-elected to the House of Representatives in a special election called to fill his seat. The formal certification of election was received by the House on May 1, 1967, but Powell did not again present himself to the House or ask to be given the oath of office.

fined him $25,000. See H. R. Res. No. 2, 91st Cong., 1st Sess., 115 Cong. Rec. H21 (daily ed., January 3, 1969). Respondents then filed a suggestion of mootness. We postponed further consideration of this suggestion to a hearing on the merits. 393 U. S. 1060 (1969).

Respondents press upon us a variety of arguments to support the court below; they will be considered in the following order. (1) Events occurring subsequent to the grant of certiorari have rendered this litigation moot. (2) The Speech or Debate Clause of the Constitution, Art. I, § 6, insulates respondents' action from judicial review. (3) The decision to exclude petitioner Powell is supported by the power granted to the House of Representatives to expel a member. (4) This Court lacks subject matter jurisdiction over petitioners' action. (5) Even if subject matter jurisdiction is present, this litigation is not justiciable either under the general criteria established by this Court or because a political question is involved.

## II.

### MOOTNESS.

After certiorari was granted, respondents filed a memorandum suggesting that two events which occurred subsequent to our grant of certiorari require that the case be dismissed as moot. On January 3, 1969, the House of Representatives of the 90th Congress officially terminated, and petitioner Powell was seated as a member of the 91st Congress. 115 Cong. Rec. H22 (daily ed., January 3, 1969). Respondents insist that the gravamen of petitioners' complaint was the failure of the 90th Congress to seat petitioner Powell and that, since the House of Representatives is not a continuing body [6]

---

[6] Respondents' authority for this assertion is a footnote contained in *Gojack* v. *United States*, 384 U. S. 702, 707, n. 4. (1966): "Neither the House of Representatives nor its committees are continuing bodies."

and Powell has now been seated, his claims are moot. Petitioners counter that three issues remain unresolved and thus this litigation presents a "case or controversy" within the meaning of Art. III:[7] (1) whether Powell was unconstitutionally deprived of his seniority by his exclusion from the 90th Congress; (2) whether the resolution of the 91st Congress imposing as "punishment" a $25,000 fine is a continuation of respondents' allegedly unconstitutional exclusion, see H. R. Res. No. 2, 91st Cong., 1st Sess., 115 Cong. Rec. H21 (daily ed., January 3, 1969); and (3) whether Powell is entitled to salary withheld after his exclusion from the 90th Congress. We conclude that Powell's claim for back salary remains viable even though he has been seated in the 91st Congress and thus find it unnecessary to determine whether the other issues have become moot.[8]

Simply stated, a case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. See E. Borchard, Declara-

---

[7] The rule that this Court lacks jurisdiction to consider the merits of a moot case is a branch of the constitutional command that the judicial power extends only to cases or controversies. See *Sibron* v. *New York*, 392 U. S. 40, 57 (1968); R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court of the United States §§ 270–271 (R. Wolfson & P. Kurland ed. 1951); Diamond, Federal Jurisdiction To Decide Moot Cases, 94 U. Pa. L. Rev. 125 (1946); Note, Cases Moot on Appeal: A Limit on the Judicial Power, 103 U. Pa. L. Rev. 772 (1955).

[8] Petitioners do not press their claim that respondent McCormack should be required to administer the oath to Powell, apparently conceding that the seating of Powell has rendered this specific claim moot. Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests. See *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 353 (1922). Respondents also argue that the seating of petitioner Powell has mooted the claims of Powell's constituents. Since this case will be remanded, that issue as well as petitioners' other claims can be disposed of by the court below.

tory Judgments 35–37 (2d ed. 1941). Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy. See *United Public Workers* v. *Mitchell,* 330 U. S. 75, 86–94 (1947); 6A J. Moore, Federal Practice ¶ 57.13 (2d ed. 1966). Despite Powell's obvious and continuing interest in his withheld salary, respondents insist that *Alejandrino* v. *Quezon,* 271 U. S. 528 (1926), leaves us no choice but to dismiss this litigation as moot. Alejandrino, a duly appointed Senator of the Philippine Islands, was suspended for one year by a resolution of the Philippine Senate and deprived of all "prerogatives, privileges and emoluments" for the period of his suspension. The Supreme Court of the Philippines refused to enjoin the suspension. By the time the case reached this Court, the suspension had expired and the Court dismissed as moot Alejandrino's request that the suspension be enjoined. Then, *sua sponte,*[9] the Court considered whether the possibility that Alejandrino was entitled to back salary required it "to retain the case for the purpose of determining whether he [Alejandrino] may not have a mandamus for this purpose." *Id.,* at 533. Characterizing the issue of Alejandrino's salary as a "mere incident" to his claim that the suspension was improper, the Court noted that he had not briefed the salary issue and that his request for mandamus did not set out with sufficient clarity the official or set of officials against whom the mandamus should issue. *Id.,* at 533–534. The Court therefore refused to treat the salary claim and dismissed the entire action as moot.

---

[9] Alejandrino's brief did not consider either the possibility that his request for injunctive relief had become moot or whether his salary claim required that the Court treat the propriety of his suspension. No brief was filed on behalf of respondents.

Respondents believe that Powell's salary claim is also a "mere incident" to his insistence that he was unconstitutionally excluded so that we should likewise dismiss this entire action as moot. This argument fails to grasp that the reason for the dismissal in *Alejandrino* was not that Alejandrino's deprivation of salary was insufficiently substantial to prevent the case from becoming moot, but rather that his failure to plead sufficient facts to establish his mandamus claim made it impossible for any court to resolve the mandamus request.[10] By contrast, petitioners' complaint names the official responsible for the payment of congressional salaries and asks for both mandamus and an injunction against that official.[11]

Futhermore, even if respondents are correct that petitioners' averments as to injunctive relief are not sufficiently definite, it does not follow that this litigation must be dismissed as moot. Petitioner Powell has not been paid his salary by virtue of an allegedly unconstitutional House resolution. That claim is still unresolved and hotly contested by clearly adverse parties. Declaratory relief has been requested, a form of relief not available

---

[10] After discussing the insufficiency of Alejandrino's averments as to the officer responsible for his salary, the Court stated: "Were that set out, the remedy of the Senator would seem to be by mandamus to compel such official in the discharge of his ministerial duty to pay him the salary due . . . ." 271 U. S., at 534. That the insufficiency of Alejandrino's averments was the reason for dismissal is further substantiated by a later passage: "As we are not able to derive from the petition sufficient information upon which properly to afford such a remedy [mandamus], we must treat the whole cause as moot and act accordingly." *Id.*, at 535.

[11] Paragraph 18b of petitioners' complaint avers that "Leake W. Johnson, as Sergeant-at-Arms of the House" is responsible for and refuses to pay Powell's salary and prays for an injunction restraining the Sergeant at Arms from implementing the House resolution depriving Powell of his salary as well as mandamus to order that the salary be paid.

when *Alejandrino* was decided.[12]   A court may grant declaratory relief even though it chooses not to issue an injunction or mandamus.   See *United Public Workers* v. *Mitchell, supra,* at 93; cf. *United States* v. *California,* 332 U. S. 19, 25–26 (1947).   A declaratory judgment can then be used as a predicate to further relief, including an injunction.   28 U. S. C. § 2202; see *Vermont Structural Slate Co.* v. *Tatko Brothers Slate Co.,* 253 F. 2d 29 (C. A. 2d Cir. 1958); *United States Lines Co.* v. *Shaughnessy,* 195 F. 2d 385 (C. A. 2d Cir. 1952). *Alejandrino* stands only for the proposition that, where one claim has become moot and the pleadings are insufficient to determine whether the plaintiff is entitled to another remedy, the action should be dismissed as moot.[13] There is no suggestion that petitioners' averments as to declaratory relief are insufficient and Powell's allegedly unconstitutional deprivation of salary remains unresolved.

Respondents further argue that Powell's "wholly incidental and subordinate" demand for salary is insufficient to prevent this litigation from becoming moot.   They suggest that the "primary and principal relief" sought was the seating of petitioner Powell in the 90th Congress rendering his presumably secondary claims not worthy of judicial consideration.   *Bond* v. *Floyd,* 385 U. S. 116 (1966), rejects respondents' theory that the mootness of a "primary" claim requires a conclusion that all "secondary" claims are moot.   At the *Bond* oral argument it was suggested that the expiration of the session of the Georgia Legislature which excluded Bond had rendered

---

[12] Federal courts were first empowered to grant declaratory judgments in 1934, see 48 Stat. 955, 10 years after Alejandrino filed his complaint.

[13] It was expressly stated in *Alejandrino* that a properly pleaded mandamus action could be brought, 271 U. S., at 535, impliedly holding that Alejandrino's salary claim had not been mooted by the expiration of his suspension.

the case moot. We replied: "The State has not pressed this argument, and it could not do so, because the State has stipulated that if Bond succeeds on this appeal he will receive back salary for the term from which he was excluded." 385 U. S., at 128, n. 4. *Bond* is not controlling, argue respondents, because the legislative term from which Bond was excluded did not end until December 31, 1966,[14] and our decision was rendered December 5; further, when *Bond* was decided, Bond had not as yet been seated while in this case Powell has been.[15] Respondents do not tell us, however, why these factual distinctions create a legally significant difference between *Bond* and this case. We relied in *Bond* on the outstanding salary claim, not the facts respondents stress, to hold that the case was not moot.

Finally, respondents seem to argue that Powell's proper action to recover salary is a suit in the Court of Claims, so that, having brought the wrong action, a dismissal for mootness is appropriate. The short answer to this argument is that it confuses mootness with whether Powell has established a right to recover against the Sergeant at Arms, a question which it is inappropriate to treat at this stage of the litigation.[16]

---

[14] Respondents do not supply any substantiation for their assertion that the term of the Georgia Legislature did not expire until December 31. Presumably, they base their statement upon Ga. Code Ann. §§ 2-1601, 2-1603 (Supp. 1968).

[15] Respondents also suggest that *Bond* is not applicable because the parties in *Bond* had stipulated that Bond would be entitled to back salary if his constitutional challenges were accepted, while there is no stipulation in this case. However, if the claim in *Bond* was moot, a stipulation by the parties could not confer jurisdiction. See, *e. g., California* v. *San Pablo & Tulare R. Co.,* 149 U. S. 308, 314 (1893).

[16] Since the court below disposed of this case on grounds of justiciability, it did not pass upon whether Powell had brought an appropriate action to recover his salary. Where a court of

## III.
### SPEECH OR DEBATE CLAUSE.

Respondents assert that the Speech or Debate Clause of the Constitution, Art. I, § 6,[17] is an absolute bar to petitioners' action. This Court has on four prior occasions—*Dombrowski* v. *Eastland,* 387 U. S. 82 (1967); *United States* v. *Johnson,* 383 U. S. 169 (1966); *Tenney* v. *Brandhove,* 341 U. S. 367 (1951); and *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881)—been called upon to determine if allegedly unconstitutional action taken by legislators or legislative employees is insulated from judicial review by the Speech or Debate Clause. Both parties insist that their respective positions find support in these cases and tender for decision three distinct issues: (1) whether respondents in participating in the exclusion of petitioner Powell were "acting in the sphere of legitimate legislative activity," *Tenney* v. *Brandhove, supra,* at 376; (2) assuming that respondents were so acting, whether the fact that petitioners seek neither damages from any of the respondents nor a criminal prosecution lifts the bar of the clause;[18] and (3) even if this

appeals has misconceived the applicable law and therefore failed to pass upon a question, our general practice has been to remand the case to that court for consideration of the remaining issues. See, *e. g., Utah Pie Co.* v. *Continental Baking Co.,* 386 U. S. 685, 704 (1967); *Bank of America National Trust & Savings Assn.* v. *Parnell,* 352 U. S. 29, 34 (1956). We believe that such action is appropriate for resolution of whether Powell in this litigation is entitled to mandamus against the Sergeant at Arms for salary withheld pursuant to the House resolution.

[17] Article I, § 6, provides: "for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place."

[18] Petitioners ask the Court to draw a distinction between declaratory relief sought against members of Congress and either an action for damages or a criminal prosecution, emphasizing that our four previous cases concerned "criminal or civil sanctions of a deterrent nature." Brief for Petitioners 171.

action may not be maintained against a Congressman, whether those respondents who are merely employees of the House may plead the bar of the clause. We find it necessary to treat only the last of these issues.

The Speech or Debate Clause, adopted by the Constitutional Convention without debate or opposition,[19] finds its roots in the conflict between Parliament and the Crown culminating in the Glorious Revolution of 1688 and the English Bill of Rights of 1689.[20] Drawing upon this history, we concluded in *United States* v. *Johnson, supra*, at 181, that the purpose of this clause was "to prevent intimidation [of legislators] by the executive and accountability before a possibly hostile judiciary." Although the clause sprang from a fear of seditious libel actions instituted by the Crown to punish unfavorable speeches made in Parliament,[21] we have held that it would be a "narrow view" to confine the protection of the Speech or Debate Clause to words spoken in debate. Committee reports, resolutions, and the act of voting are equally covered, as are "things generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn* v. *Thompson, supra,* at 204. Furthermore, the clause not only provides a

---

[19] See 5 Debates on the Federal Constitution 406 (J. Elliot ed. 1876); 2 Records of the Federal Convention of 1787, p. 246 (M. Farrand rev. ed. 1966) (hereinafter cited as Farrand).

[20] The English Bill of Rights contained a provision substantially identical to Art. I, § 6: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 W. & M., Sess. 2, c. 2. The English and American colonial history is traced in some detail in Cella, The Doctrine of Legislative Privilege of Freedom of Speech and Debate: Its Past, Present and Future as a Bar to Criminal Prosecutions in the Courts, 2 Suffolk U. L. Rev. 1, 3–16 (1968), and Yankwich, The Immunity of Congressional Speech—Its Origin, Meaning and Scope, 99 U. Pa. L. Rev. 960, 961–966 (1951).

[21] *United States* v. *Johnson*, 383 U. S. 169, 182–183 (1966).

defense on the merits but also protects a legislator from the burden of defending himself. *Dombrowski* v. *Eastland, supra,* at 85; see *Tenney* v. *Brandhove, supra,* at 377.

Our cases make it clear that the legislative immunity created by the Speech or Debate Clause performs an important function in representative government. It insures that legislators are free to represent the interests of their constituents without fear that they will be later called to task in the courts for that representation. Thus, in *Tenney* v. *Brandhove, supra,* at 373, the Court quoted the writings of James Wilson as illuminating the reason for legislative immunity: "In order to enable and encourage a representative of the publick to discharge his publick trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence." [22]

Legislative immunity does not, of course, bar all judicial review of legislative acts. That issue was settled by implication as early as 1803, see *Marbury* v. *Madison,* 1 Cranch 137, and expressly in *Kilbourn* v. *Thompson,* the first of this Court's cases interpreting the reach of the Speech or Debate Clause. Challenged in *Kilbourn* was the constitutionality of a House Resolution ordering the arrest and imprisonment of a recalcitrant witness who had refused to respond to a subpoena issued by a House investigating committee. While holding that the Speech or Debate Clause barred Kilbourn's action for false imprisonment brought against several members of the House, the Court nevertheless reached the merits of Kilbourn's attack and decided that, since the House had no power to punish for contempt, Kilbourn's imprisonment

---

[22] 1 The Works of James Wilson 421 (R. McCloskey ed. 1967).

pursuant to the resolution was unconstitutional. It therefore allowed Kilbourn to bring his false imprisonment action against Thompson, the House's Sergeant at Arms, who had executed the warrant for Kilbourn's arrest.

The Court first articulated in *Kilbourn* and followed in *Dombrowski* v. *Eastland* [23] the doctrine that, although an action against a Congressman may be barred by the Speech or Debate Clause, legislative employees who participated in the unconstitutional activity are responsible for their acts. Despite the fact that petitioners brought this suit against several House employees—the Sergeant at Arms, the Doorkeeper and the Clerk—as well as several Congressmen, respondents argue that *Kilbourn* and *Dombrowski* are distinguishable. Conceding that in *Kilbourn* the presence of the Sergeant at Arms and in *Dombrowski* the presence of a congressional subcommittee counsel as defendants in the litigation allowed judicial review of the challenged congressional action, respondents urge that both cases concerned an affirmative act performed by the employee outside the House having a direct effect upon a private citizen. Here, they continue, the relief sought relates to actions taken by House agents solely within the House. Alternatively, respondents insist that Kilbourn and Dombrowski prayed for damages while petitioner Powell asks that the Sergeant at Arms disburse funds, an assertedly greater interference with the legislative process. We reject the proffered distinctions.

That House employees are acting pursuant to express orders of the House does not bar judicial review of the constitutionality of the underlying legislative decision.

---

[23] In *Dombrowski* $500,000 in damages was sought against a Senator and the chief counsel of a Senate Subcommittee chaired by that Senator. Record in No. 118, O. T. 1966, pp. 10–11. We affirmed the grant of summary judgment as to the Senator but reversed as to subcommittee counsel.

*Kilbourn* decisively settles this question, since the Sergeant at Arms was held liable for false imprisonment even though he did nothing more than execute the House Resolution that Kilbourn be arrested and imprisoned.[24] Respondents' suggestions thus ask us to distinguish between affirmative acts of House employees and situations in which the House orders its employees not to act or between actions for damages and claims for salary. We can find no basis in either the history of the Speech or Debate Clause or our cases for either distinction. The purpose of the protection afforded legislators is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into court to defend their actions. A legislator is no more or no less hindered or distracted by litigation against a legislative employee calling into question the employee's affirmative action than he would be by a lawsuit questioning the employee's failure to act. Nor is the distraction or hindrance increased because the claim is for salary rather than damages, or because the litigation questions action taken by the employee within rather than without the House. Freedom of legislative activity and the purposes of the Speech or Debate Clause are fully protected if legislators are relieved of the burden of defending themselves.[25] In *Kilbourn* and *Dombrowski*

[24] The Court in *Kilbourn* quoted extensively from *Stockdale* v. *Hansard*, 9 Ad. & E. 1, 114, 112 Eng. Rep. 1112, 1156 (Q. B. 1839), to refute the assertion that House agents were immune because they were executing orders of the House: "[I]f the Speaker, by authority of the House, order an illegal Act, though that authority shall exempt him from question, his order shall no more justify the person who executed it than King Charles's warrant for levying ship-money could justify his revenue officer." Kilbourn eventually recovered $20,000 against Thompson. See *Kilbourn* v. *Thompson*, MacArth. & M. 401, 432 (Sup. Ct. D. C. 1883).

[25] A Congressman is not by virtue of the Speech or Debate Clause absolved of the responsibility of filing a motion to dismiss and the

we thus dismissed the action against members of Congress but did not regard the Speech or Debate Clause as a bar to reviewing the merits of the challenged congressional action since congressional employees were also sued. Similarly, though this action may be dismissed against the Congressmen petitioners are entitled to maintain their action against House employees and to judicial review of the propriety of the decision to exclude petitioner Powell.[26] As was said in *Kilbourn,* in language which time has not dimmed:

> "Especially is it competent and proper for this court to consider whether its [the legislature's] proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void."   103 U. S., at 199.

## IV.

### EXCLUSION OR EXPULSION.

The resolution excluding petitioner Powell was adopted by a vote in excess of two-thirds of the 434 Members of

---

trial court must still determine the applicability of the clause to plaintiff's action. See *Tenney* v. *Brandhove,* 341 U. S. 367, 377 (1951).

[26] Given our disposition of this issue, we need not decide whether under the Speech or Debate Clause petitioners would be entitled to maintain this action solely against members of Congress where no agents participated in the challenged action and no other remedy was available. Cf. *Kilbourn* v. *Thompson,* 103 U. S. 168, 204–205 (1881).

Congress—307 to 116. 113 Cong. Rec. 5037–5038. Article I, § 5, grants the House authority to expel a member "with the Concurrence of two thirds." [27] Respondents assert that the House may expel a member for any reason whatsoever and that, since a two-thirds vote was obtained, the procedure by which Powell was denied his seat in the 90th Congress should be regarded as an expulsion, not an exclusion. Cautioning us not to exalt form over substance, respondents quote from the concurring opinion of Judge McGowan in the court below:

> "Appellant Powell's cause of action for a judicially compelled seating thus boils down, in my view, to the narrow issue of whether a member found by his colleagues . . . to have engaged in official misconduct must, because of the accidents of timing, be formally admitted before he can be either investigated or expelled. The sponsor of the motion to exclude stated on the floor that he was proceeding on the theory that the power to expel included the power to exclude, provided a ⅔ vote was forthcoming. It was. Therefore, success for Mr. Powell on the merits would mean that the District Court must admonish the House that it is form, not substance, that should govern in great affairs, and accordingly command the House members to act out a charade." 129 U. S. App. D. C., at 383–384, 395 F. 2d, at 606–607.

---

[27] Powell was "excluded" from the 90th Congress, *i. e.,* he was not administered the oath of office and was prevented from taking his seat. If he had been allowed to take the oath and subsequently had been required to surrender his seat, the House's action would have constituted an "expulsion." Since we conclude that Powell was excluded from the 90th Congress, we express no view on what limitations may exist on Congress' power to expel or otherwise punish a member once he has been seated.

Although respondents repeatedly urge this Court not to speculate as to the reasons for Powell's exclusion, their attempt to equate exclusion with expulsion would require a similar speculation that the House would have voted to expel Powell had it been faced with that question. Powell had not been seated at the time House Resolution No. 278 was debated and passed. After a motion to bring the Select Committee's proposed resolution to an immediate vote had been defeated, an amendment was offered which mandated Powell's exclusion.[28] Mr. Celler, chairman of the Select Committee, then posed a parliamentary inquiry to determine whether a two-thirds vote was necessary to pass the resolution if so amended "in the sense that it might amount to an expulsion." 113 Cong. Rec. 5020. The Speaker replied that "action by a majority vote would be in accordance with the rules." *Ibid.* Had the amendment been regarded as an attempt to expel Powell, a two-thirds vote would have been constitutionally required. The Speaker ruled that the House was voting to exclude Powell, and we will not speculate what the result might have been if Powell had been seated and expulsion proceedings subsequently instituted.

Nor is the distinction between exclusion and expulsion merely one of form. The misconduct for which Powell was charged occurred prior to the convening of the 90th Congress. On several occasions the House has debated whether a member can be expelled for actions taken during a prior Congress and the House's own manual of procedure applicable in the 90th Congress states that "both Houses have distrusted their power to punish in such cases." Rules of the House of Representatives, H. R. Doc. No. 529, 89th Cong., 2d Sess., 25 (1967);

---

[28] House Resolution No. 278, as amended and adopted, provided: "That said Adam Clayton Powell . . . be and the same hereby is *excluded* from membership in the 90th Congress . . . ." 113 Cong. Rec. 5020. (Emphasis added.)

see G. Galloway, History of the House of Representatives 32 (1961). The House rules manual reflects positions taken by prior Congresses. For example, the report of the Select Committee appointed to consider the expulsion of John W. Langley states unequivocally that the House will not expel a member for misconduct committed during an earlier Congress:

> "[I]t must be said that with practical uniformity the precedents in such cases are to the effect that the House will not expel a Member for reprehensible action prior to his election as a Member, not even for conviction for an offense. On May 23, 1884, Speaker Carlisle decided that the House had no right to punish a Member for any offense alleged to have been committed previous to the time when he was elected a Member, and added, 'That has been so frequently decided in the House that it is no longer a matter of dispute.'" H. R. Rep. No. 30, 69th Cong., 1st Sess., 1–2 (1925).[29]

---

[29] Other Congresses have expressed an identical view. The Report of the Judiciary Committee concerning the proposed expulsion of William S. King and John G. Schumaker informed the House:

"Your committee are of opinion that the House of Representatives has no authority to take jurisdiction of violations of law or offenses committed against a previous Congress. This is purely a legislative body, and entirely unsuited for the trial of crimes. The fifth section of the first article of the Constitution authorizes 'each house to determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member.' This power is evidently given to enable each house to exercise its constitutional function of legislation unobstructed. It cannot vest in Congress a jurisdiction to try a member for an offense committed before his election; for such offense a member, like any other citizen, is amenable to the courts alone." H. R. Rep. No. 815, 44th Cong., 1st Sess., 2 (1876).

See also 15 Cong. Rec. 4434 (1884) (ruling of the Speaker); H. R. Rep. No. 81, 42d Cong., 3d Sess., 8 (1873) (expulsion of James Brooks and Oakes Ames); H. R. Rep. No. 179, 35th Cong., 1st Sess., 4–5 (1858) (expulsion of Orsamus B. Matteson).

Members of the House having expressed a belief that such strictures apply to its own power to expel, we will not assume that two-thirds of its members would have expelled Powell for his prior conduct had the Speaker announced that House Resolution No. 278 was for expulsion rather than exclusion.[30]

Finally, the proceedings which culminated in Powell's exclusion cast considerable doubt upon respondents' assumption that the two-thirds vote necessary to expel would have been mustered. These proceedings have been succinctly described by Congressman Eckhardt:

> "The House voted 202 votes for the previous question[31] leading toward the adoption of the [Select] Committee report. It voted 222 votes against the previous question, opening the floor for the Curtis Amendment which ultimately excluded Powell.

[30] We express no view as to whether such a ruling would have been proper. A further distinction between expulsion and exclusion inheres in the fact that a member whose expulsion is contemplated may as a matter of right address the House and participate fully in debate while a member-elect apparently does not have a similar right. In prior cases the member whose expulsion was under debate has been allowed to make a long and often impassioned defense. See Cong. Globe, 42d Cong., 3d Sess., 1723 (1873) (expulsion of Oakes Ames); Cong. Globe, 41st Cong., 2d Sess., 1524–1525, 1544 (1870) (expulsion of B. F. Whittemore); Cong. Globe, 34th Cong., 3d Sess., 925–926 (1857) (expulsion of William A. Gilbert); Cong. Globe, 34th Cong., 3d Sess., 947–951 (1857) (expulsion of William W. Welch); 9 Annals of Cong. 2966 (1799) (expulsion of Matthew Lyon). On at least one occasion the member has been allowed to cross-examine other members during the expulsion debate. 2 A. Hinds, Precedents of the House of Representatives § 1643 (1907).

[31] A motion for the previous question is a debate-limiting device which, when carried, has the effect of terminating debate and of forcing a vote on the subject at hand. See Rules of the House of Representatives, H. R. Doc. No. 529, 89th Cong., 2d Sess., §§ 804–809 (1967); Cannon's Procedure in the House of Representatives, H. R. Doc. No. 610, 87th Cong., 2d Sess., 277–281 (1963).

"Upon adoption of the Curtis Amendment, the vote again fell short of two-thirds, being 248 yeas to 176 nays. Only on the final vote, adopting the Resolution as amended, was more than a two-thirds vote obtained, the vote being 307 yeas to 116 nays. On this last vote, as a practical matter, members who would not have denied Powell a seat if they were given the choice to punish him had to cast an aye vote or else record themselves as opposed to the only punishment that was likely to come before the House. Had the matter come up through the processes of expulsion, it appears that the two-thirds vote would have failed, and then members would have been able to apply a lesser penalty." [32]

We need express no opinion as to the accuracy of Congressman Eckhardt's prediction that expulsion proceedings would have produced a different result. However, the House's own views of the extent of its power to expel

---

[32] Eckhardt, The Adam Clayton Powell Case, 45 Texas L. Rev. 1205, 1209 (1967). The views of Congressman Eckhardt were echoed during the exclusion proceedings. Congressman Cleveland stated that, although he voted in favor of and supported the Select Committee's recommendation, if the exclusion amendment received a favorable vote on the motion for the previous question, then he would support the amendment "on final passage." 113 Cong. Rec. 5031. Congressman Gubser was even more explicit:

"I shall vote against the previous question on the Curtis amendment simply because I believe future and perfecting amendments should be allowed. But if the previous question is ordered, then I will be placed on the horns of an impossible dilemma.

"Mr. Speaker, I want to expel Adam Clayton Powell, by seating him first, but that will not be my choice when the Curtis amendment is before us. I will be forced to vote for exclusion, about which I have great constitutional doubts, or to vote for no punishment at all. Given this raw and isolated issue, the only alternative I can follow is to vote for the Curtis amendment. I shall do so, Mr. Speaker, with great reservation." *Ibid.*

combined with the Congressman's analysis counsel that exclusion and expulsion are not fungible proceedings. The Speaker ruled that House Resolution No. 278 contemplated an exclusion proceeding. We must reject respondents' suggestion that we overrule the Speaker and hold that, although the House manifested an intent to exclude Powell, its action should be tested by whatever standards may govern an expulsion.

## V.

### SUBJECT MATTER JURISDICTION.

As we pointed out in *Baker* v. *Carr,* 369 U. S. 186, 198 (1962), there is a significant difference between determining whether a federal court has "jurisdiction of the subject matter" and determining whether a cause over which a court has subject matter jurisdiction is "justiciable." The District Court determined that "to decide this case on the merits . . . would constitute a clear violation of the doctrine of separation of powers" and then dismissed the complaint "for want of jurisdiction of the subject matter." *Powell* v. *McCormack,* 266 F. Supp. 354, 359, 360 (D. C. D. C. 1967). However, as the Court of Appeals correctly recognized, the doctrine of separation of powers is more properly considered in determining whether the case is "justiciable." We agree with the unanimous conclusion of the Court of Appeals that the District Court had jurisdiction over the subject matter of this case.[33] However, for reasons set forth in Part VI, *infra,* we disagree with the Court of Appeals' conclusion that this case is not justiciable.

In *Baker* v. *Carr, supra,* we noted that a federal district court lacks jurisdiction over the subject matter (1) if the

---

[33] Although each judge of the panel wrote a separate opinion, all were clear in stating that the District Court possessed subject matter jurisdiction. *Powell* v. *McCormack,* 129 U. S. App. D. C. 354, 368, 384, 385, 395 F. 2d 577, 591, 607, 608 (1968).

cause does not "arise under" the Federal Constitution, laws, or treaties (or fall within one of the other enumerated categories of Art. III); or (2) if it is not a "case or controversy" within the meaning of that phrase in Art. III; or (3) if the cause is not one described by any jurisdictional statute. And, as in *Baker* v. *Carr*, *supra*, our determination (see Part VI, B (1) *infra*) that this cause presents no nonjusticiable "political question" disposes of respondents' contentions[34] that this cause is not a "case or controversy."[35]

Respondents first contend that this is not a case "arising under" the Constitution within the meaning of Art. III. They emphasize that Art. I, § 5, assigns to each House of Congress the power to judge the elections and qualifications of its own members and to punish its members for disorderly behavior. Respondents also note that under Art. I, § 3, the Senate has the "sole power" to try all impeachments. Respondents argue that these delegations (to "judge," to "punish," and to "try") to the Legislative Branch are explicit grants of "judicial power" to the Congress and constitute specific exceptions

---

[34] We have determined that the case is not moot. See Part II, *supra*.

[35] Indeed, the thrust of respondents' argument on this jurisdictional issue is similar to their contentions that this case presents a nonjusticiable "political question." They urge that it would have been "unthinkable" to the Framers of the Constitution for courts to review the decision of a legislature to exclude a member. However, we have previously determined that a claim alleging that a legislature has abridged an individual's constitutional rights by refusing to seat an elected representative constitutes a "case or controversy" over which federal courts have jurisdiction. See *Bond* v. *Floyd*, 385 U. S. 116, 131 (1966). To the extent the expectations of the Framers are discernible and relevant to this case, they must therefore relate to the special problem of review by *federal* courts of actions of the *federal* legislature. This is of course a problem of separation of powers and is to be considered in determining justiciability. See *Baker* v. *Carr*, 369 U. S. 186, 210 (1962).

to the general mandate of Art. III that the "judicial power" shall be vested in the federal courts. Thus, respondents maintain, the "power conferred on the courts by article III does not authorize this Court to do anything more than declare its lack of jurisdiction to proceed." [36]

We reject this contention. Article III, § 1, provides that the "judicial Power . . . shall be vested in one supreme Court, and in such inferior Courts as the Congress may . . . establish." Further, § 2 mandates that the "judicial Power shall extend to all Cases . . . arising under this Constitution. . . ." It has long been held that a suit "arises under" the Constitution if a petitioner's claim "will be sustained if the Constitution . . . [is] given one construction and will be defeated if [it is] given another." [37] *Bell* v. *Hood,* 327 U. S. 678, 685 (1946). See *King County* v. *Seattle School District No. 1,* 263 U. S. 361, 363–364 (1923). Cf. *Osborn* v. *Bank of the United States,* 9 Wheat. 738 (1824). See generally C. Wright, Federal Courts 48–52 (1963). Thus, this case clearly is one "arising under" the Constitution as the Court has interpreted that phrase. Any bar to federal courts reviewing the judgments made by the House or Senate in excluding a member arises from the allocation of powers between the two branches of the Federal Government (a question of justiciability), and not from the petitioners' failure to state a claim based on federal law.

Respondents next contend that the Court of Appeals erred in ruling that petitioners' suit is authorized by a jurisdictional statute, *i. e.,* 28 U. S. C. § 1331 (a).

[36] Brief for Respondents 39.

[37] Petitioners' complaint is predicated, *inter alia,* on several sections of Article I, Article III, and several amendments to the Constitution. Respondents do not challenge the substantiality of these claims.

Section 1331 (a) provides that district courts shall have jurisdiction in "all civil actions wherein the matter in controversy . . . arises under the Constitution . . . ." Respondents urge that even though a case may "arise under the Constitution" for purposes of Art. III, it does not necessarily "arise under the Constitution" for purposes of § 1331 (a). Although they recognize there is little legislative history concerning the enactment of § 1331 (a), respondents argue that the history of the period when the section was first enacted indicates that the drafters did not intend to include suits questioning the exclusion of Congressmen in this grant of "federal question" jurisdiction.

Respondents claim that the passage of the Force Act [38] in 1870 lends support to their interpretation of the intended scope of § 1331. The Force Act gives the district courts jurisdiction over "any civil action to recover possession of any office . . . wherein it appears that the sole question . . . arises out of denial of the right to vote . . . on account of race, color or previous condition of servitude." However, the Act specifically excludes suits concerning the office of Congressman. Respondents maintain that this exclusion demonstrates Congress' intention to prohibit federal courts from entertaining suits regarding the seating of Congressmen.

We have noted that the grant of jurisdiction in § 1331 (a), while made in the language used in Art. III, is not in all respects co-extensive with the potential for federal jurisdiction found in Art. III. See *Zwickler* v. *Koota,* 389 U. S. 241, 246, n. 8 (1967). Nevertheless, it has generally been recognized that the intent of the drafters was to provide a broad jurisdictional grant to the federal courts. See, *e. g.,* Mishkin, The Federal "Question" in the District Courts, 53 Col. L.

[38] Act of May 31, 1870, § 23, 16 Stat. 146. The statute is now 28 U. S. C. § 1344.

Rev. 157, 160 (1953); Chadbourn & Levin, Original Jurisdiction of Federal Questions, 90 U. Pa. L. Rev. 639, 644–645 (1942). And, as noted above, the resolution of this case depends directly on construction of the Constitution. The Court has consistently held such suits are authorized by the statute. *Bell* v. *Hood, supra; King County* v. *Seattle School District No. 1, supra.* See, *e. g., Gully* v. *First Nat. Bank in Meridian,* 299 U. S. 109, 112 (1936); *The Fair* v. *Kohler Die & Specialty Co.,* 228 U. S. 22, 25 (1913).

As respondents recognize, there is nothing in the wording or legislative history of § 1331 or in the decisions of this Court which would indicate that there is any basis for the interpretation they would give that section. Nor do we think the passage of the Force Act indicates that § 1331 does not confer jurisdiction in this case. The Force Act is limited to election challenges where a denial of the right to vote in violation of the Fifteenth Amendment is alleged. See 28 U. S. C. § 1344. Further, the Act was passed five years before the original version of § 1331 was enacted. While it might be inferred that Congress intended to give each House the exclusive power to decide congressional election challenges,[39] there is absolutely no indication that the passage of this Act evidences an intention to impose other restrictions on the broad grant of jurisdiction in § 1331.

## VI.

### JUSTICIABILITY.

Having concluded that the Court of Appeals correctly ruled that the District Court had jurisdiction over the subject matter, we turn to the question whether the case is justiciable. Two determinations must be made in this regard. First, we must decide whether the claim

---

[39] See Cong. Globe, 41st Cong., 2d Sess., 3872 (1870).

presented and the relief sought are of the type which admit of judicial resolution. Second, we must determine whether the structure of the Federal Government renders the issue presented a "political question"—that is, a question which is not justiciable in federal court because of the separation of powers provided by the Constitution.

### A. *General Considerations.*

In deciding generally whether a claim is justiciable, a court must determine whether "the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker* v. *Carr, supra,* at 198. Respondents do not seriously contend that the duty asserted and its alleged breach cannot be judicially determined. If petitioners are correct, the House had a duty to seat Powell once it determined he met the standing requirements set forth in the Constitution. It is undisputed that he met those requirements and that he was nevertheless excluded.

Respondents do maintain, however, that this case is not justiciable because, they assert, it is impossible for a federal court to "mold effective relief for resolving this case." Respondents emphasize that petitioners asked for coercive relief against the officers of the House, and, they contend, federal courts cannot issue mandamus or injunctions compelling officers or employees of the House to perform specific official acts. Respondents rely primarily on the Speech or Debate Clause to support this contention.

We need express no opinion about the appropriateness of coercive relief in this case, for petitioners sought a declaratory judgment, a form of relief the District Court could have issued. The Declaratory Judgment Act, 28 U. S. C. § 2201, provides that a district court may "declare the rights . . . of any interested party . . . whether or not further relief is or could be sought." The

availability of declaratory relief depends on whether there is a live dispute between the parties, *Golden* v. *Zwickler,* 394 U. S. 103 (1969), and a request for declaratory relief may be considered independently of whether other forms of relief are appropriate. See *United Public Workers* v. *Mitchell,* 330 U. S. 75, 93 (1947); 6A J. Moore, Federal Practice ¶ 57.08 [3] (2d ed. 1966); cf. *United States* v. *California,* 332 U. S. 19, 25–26 (1947). We thus conclude that in terms of the general criteria of justiciability, this case is justiciable.

### B. *Political Question Doctrine.*

1. Textually Demonstrable Constitutional Commitment.

Respondents maintain that even if this case is otherwise justiciable, it presents only a political question. It is well established that the federal courts will not adjudicate political questions. See, *e. g., Coleman* v. *Miller,* 307 U. S. 433 (1939); *Oetjen* v. *Central Leather Co.,* 246 U. S. 297 (1918). In *Baker* v. *Carr, supra,* we noted that political questions are not justiciable primarily because of the separation of powers within the Federal Government. After reviewing our decisions in this area, we concluded that on the surface of any case held to involve a political question was at least one of the following formulations:

> "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality

of embarrassment from multifarious pronouncements by various departments on one question." 369 U. S., at 217.

Respondents' first contention is that this case presents a political question because under Art. I, § 5, there has been a "textually demonstrable constitutional commitment" to the House of the "adjudicatory power" to determine Powell's qualifications. Thus it is argued that the House, and the House alone, has power to determine who is qualified to be a member.[40]

In order to determine whether there has been a textual commitment to a co-ordinate department of the Government, we must interpret the Constitution. In other words, we must first determine what power the Constitution confers upon the House through Art. I, § 5, before we can determine to what extent, if any, the exercise of that power is subject to judicial review. Re-

---

[40] Respondents rely on *Barry* v. *United States ex rel. Cunningham,* 279 U. S. 597 (1929). *Barry* involved the power of the Senate to issue an arrest warrant to summon a witness to give testimony concerning a senatorial election. The Court ruled that issuance of the warrant was constitutional, relying on the power of the Senate under Art. I, § 5, to be the judge of the elections of its members. Respondents particularly rely on language the Court used in discussing the power conferred by Art. I, § 5. The Court noted that under § 5 the Senate could "render a judgment which is beyond the authority of any other tribunal to review." *Id.,* at 613.

*Barry* provides no support for respondents' argument that this case is not justiciable, however. First, in *Barry* the Court reached the merits of the controversy, thus indicating that actions allegedly taken pursuant to Art. I, § 5, are not automatically immune from judicial review. Second, the quoted statement is dictum; and, later in the same opinion, the Court noted that the Senate may exercise its power subject "to the restraints imposed by or found in the implications of the Constitution." *Id.,* at 614. Third, of course, the statement in *Barry* leaves open the particular question that must first be resolved in this case: the existence and scope of the textual commitment to the House to judge the qualifications of members.

spondents maintain that the House has broad power under § 5, and, they argue, the House may determine which are the qualifications necessary for membership. On the other hand, petitioners allege that the Constitution provides that an elected representative may be denied his seat only if the House finds he does not meet one of the standing qualifications expressly prescribed by the Constitution.

If examination of § 5 disclosed that the Constitution gives the House judicially unreviewable power to set qualifications for membership and to judge whether prospective members meet those qualifications, further review of the House determination might well be barred by the political question doctrine. On the other hand, if the Constitution gives the House power to judge only whether elected members possess the three standing qualifications set forth in the Constitution,[41] further consideration would be necessary to determine whether any of the other formulations of the political question doctrine are

---

[41] In addition to the three qualifications set forth in Art. I, § 2, Art. I, § 3, cl. 7, authorizes the disqualification of any person convicted in an impeachment proceeding from "any Office of honor, Trust or Profit under the United States"; Art. I, § 6, cl. 2, provides that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office"; and § 3 of the 14th Amendment disqualifies any person "who, having previously taken an oath . . . to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof." It has been argued that each of these provisions, as well as the Guarantee Clause of Article IV and the oath requirement of Art. VI, cl. 3, is no less a "qualification" within the meaning of Art. I, § 5, than those set forth in Art. I, § 2. Dionisopoulos, A Commentary on the Constitutional Issues in the Powell and Related Cases, 17 J. Pub. L. 103, 111–115 (1968). We need not reach this question, however, since both sides agree that Powell was not ineligible under any of these provisions.

"inextricable from the case at bar." [42]   *Baker* v. *Carr, supra,* at 217.

In other words, whether there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department" of government and what is the scope of such commitment are questions we must resolve for the first time in this case. [43]   For, as we pointed out in *Baker* v. *Carr, supra,* "[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." *Id.,* at 211.

In order to determine the scope of any "textual commitment" under Art. I, § 5, we necessarily must determine the meaning of the phrase to "be the Judge of the Qualifications of its own Members." Petitioners argue that the records of the debates during the Constitutional Convention; available commentary from the post-Convention, pre-ratification period; and early congressional applications of Art. I, § 5, support their construction of the section. Respondents insist, however, that a careful examination of the pre-Convention practices of the English Parliament and American colonial assemblies demonstrates that by 1787, a legislature's power to judge the qualifications of its members was generally under-

---

[42] Consistent with this interpretation, federal courts might still be barred by the political question doctrine from reviewing the House's factual determination that a member did not meet one of the standing qualifications. This is an issue not presented in this case and we express no view as to its resolution.

[43] Indeed, the force of respondents' other arguments that this case presents a political question depends in great measure on the resolution of the textual commitment question. See Part VI, B (2), *infra.*

stood to encompass exclusion or expulsion on the ground that an individual's character or past conduct rendered him unfit to serve. When the Constitution and the debates over its adoption are thus viewed in historical perspective, argue respondents, it becomes clear that the "qualifications" expressly set forth in the Constitution were not meant to limit the long-recognized legislative power to exclude or expel at will, but merely to establish "standing incapacities," which could be altered only by a constitutional amendment. Our examination of the relevant historical materials leads us to the conclusion that petitioners are correct and that the Constitution leaves the House [44] without authority to *exclude* any person, duly elected by his constituents, who meets all the requirements for membership expressly prescribed in the Constitution.

### a. The Pre-Convention Precedents.

Since our rejection of respondents' interpretation of § 5 results in significant measure from a disagreement with their historical analysis, we must consider the relevant historical antecedents in considerable detail. As do respondents, we begin with the English and colonial precedents.

The earliest English exclusion precedent appears to be a declaration by the House of Commons in 1553 "that Alex. Nowell, being Prebendary [*i. e.,* a clergyman] in Westminster, and thereby having voice in the Convocation House, cannot be a member of this House . . . ." J. Tanner, Tudor Constitutional Documents: A. D. 1485–1603, p. 596 (2d ed. 1930). This decision, however, was

---

[44] Since Art. I, § 5, cl. 1, applies to both Houses of Congress, the scope of the Senate's power to judge the qualifications of its members necessarily is identical to the scope of the House's power, with the exception, of course, that Art. I, § 3, cl. 3, establishes different age and citizenship requirements for membership in the Senate.

consistent with a long-established tradition that clergy who participated in their own representative assemblies or convocations were ineligible for membership in the House of Commons.[45] See 1 E. Porritt, The Unreformed House of Commons 125 (1963); T. Taswell-Langmead's English Constitutional History 142–143 (11th ed. T. Plucknett 1960). The traditional ineligibility of clergymen was recognized as a standing incapacity.[46] See 1 W. Blackstone's Commentaries *175. Nowell's exclusion, therefore, is irrelevant to the present case, for petitioners concede—and we agree—that if Powell had not met one of the standing qualifications set forth in the Constitution, he could have been excluded under Art. I, § 5. The earliest colonial exclusions also fail to support respondents' theory.[47]

---

[45] Since the reign of Henry IV (1399–1413), no clergyman had sat in the House of Commons. 1 E. Porritt, The Unreformed House of Commons 125 (1963).

[46] Because the British do not have a written constitution, standing incapacities or disqualifications for membership in Parliament are derived from "the custom and law of parliament." 1 W. Blackstone's Commentaries *162; see id., at *175. The groups thus disqualified as of 1770 included aliens; minors; judges who sat in the House of Lords; clergy who were represented in their own convocation; persons "attainted of treason or felony"; sheriffs, mayors, and bailiffs as representatives for their own jurisdictions; and certain taxing officials and officers of the Crown. Id., at *175–176. Not until the exclusion of John Wilkes, discussed infra, did Blackstone subscribe to the theory that, in addition, the Commons could declare ineligible an individual "in particular [unspecified] circumstances . . . for that parliament" if it deemed him unfit to serve on grounds not encompassed by the recognized standing incapacities. As we explain, infra, this position was subsequently repudiated by the House in 1782. A Clerk of the House of Commons later referred to cases in which this theory was relied upon "as examples of an excess of . . . jurisdiction by the Commons; for one house of Parliament cannot create a disability unknown to the law." T. May's Parliamentary Practice 67 (13th ed. T. Webster 1924).

[47] In 1619, the Virginia House of Burgesses challenged the eligibility of certain delegates on the ground that they did not hold their

Respondents' remaining 16th and 17th century English precedents all are cases of expulsion, although some were for misdeeds not encompassed within recognized standing incapacities existing either at the time of the expulsions or at the time the Constitution was drafted in 1787.[48] Although these early expulsion orders occasionally contained statements suggesting that the individual expelled was thereafter ineligible for re-election, at least for the duration of the Parliament from which he was expelled,[49]

---

plantations under proper patents from the Virginia Company in England. See generally 7 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws 3783–3810 (F. Thorpe ed. 1909) (hereinafter cited as Thorpe). One of them, a Captain Warde, was admitted on condition that he obtain the necessary patent. The others, representatives from Martin's Brandon plantation, were excluded on the ground that the owner of the plantation had claimed that his patent exempted him from the colony's laws. See Journals of the House of Burgesses of Virginia: 1619–1658/59, pp. 4–5 (1915); M. Clarke, Parliamentary Privilege in the American Colonies 133–134 (1943). The questions presented by these two cases, therefore, seem to be jurisdictional in nature; that is, an attempt was made to gain representation for plantations over which the assembly may have had no power to act. Thus viewed these cases are analogous to the exclusions for failure to comply with standing qualifications. They certainly are not precedents which support the view that a legislative body could exclude members for mere character defects or prior misconduct disapproved by the assembly. See generally Clarke, *supra*, at 132–204; J. Greene, The Quest for Power: The Lower Houses of Assembly in the Southern Royal Colonies: 1689–1776, pp. 171–204 (1963).

[48] For example, in 1585 the Commons expelled a Doctor Parry for unspecified misbehavior. A Compleat Journal of the Votes, Speeches and Debates of the House of Lords and House of Commons Throughout the Whole Reign of Queen Elizabeth, of Glorious Memory 352 (S. D'Ewes ed. 1708); and in 1628 Sir Edmund Sawyer was expelled because he had sought to induce a witness to suppress evidence against Sir Edmund in testimony before the House. 1 H. C. Jour. 917.

[49] In expelling Sir Edmund Sawyer in 1628, the Commons declared "him to be unworthy ever to serve as a Member of this House."

there is no indication that any were re-elected and thereafter excluded. Respondents' colonial precedents during this period follow a similar pattern.[50]

Apparently the re-election of an expelled member first occurred in 1712. The House of Commons had expelled Robert Walpole for receiving kickbacks for contracts relating to "foraging the Troops," 17 H. C. Jour. 28, and committed him to the Tower. Nevertheless, two months later he was re-elected. The House thereupon resolved "[t]hat Robert Walpole, Esquire, having been, this Session of Parliament, committed a Prisoner to the *Tower* of *London,* and expelled [from] this House, . . . is, incapable of being elected a Member to serve *in this present Parliament . . . ." Id.,* at 128. (Second emphasis added.) A new election was ordered, and Walpole was not re-elected. At least two similar exclusions after an initial expulsion were effected in the American colonies during the first half of the 18th century.[51]

---

*Ibid.* Almost identical language was used in the expulsion of H. Benson in 1641. 2 *id.,* at 301. But by 1642, the formula had been changed to "disabled to serve any longer *in this Parliament* as *a Member of this House . . . ." Id.,* at 703. (Emphasis added.) By the 18th century it was apparently well established that an expulsion by the House of Commons could last no longer than the duration of the Parliament from which the member was expelled. See 1 W. Blackstone's Commentaries *176.

[50] For example, in 1652, the Virginia House of Burgesses expelled two members for prior conduct disapproved by the assembly, Journals of the House of Burgesses, *supra,* at 85; and in 1683, Rhode Island expelled a member "from acting in this present Assembly" for refusing to answer a court summons. 1 S. Arnold, History of the State of Rhode Island and Providence Plantations 289 (1859). See generally Clarke, *supra,* at 173–204.

[51] In 1726, the Massachusetts House of Representatives excluded Gershom Woodle, who had been expelled on three previous occasions as "unworthy to be a Member." 7 Journals of the House of Representatives of Massachusetts 1726–1727, pp. 4–5, 15, 68–69 (1926). In 1758, North Carolina expelled Francis Brown for perjury. He

526

Respondents urge that the Walpole case provides strong support for their conclusion that the pre-Convention English and colonial practice was that members-elect could be excluded for their prior misdeeds at the sole discretion of the legislative body to which they had been elected. However, this conclusion overlooks an important limiting characteristic of the Walpole case and of both the colonial exclusion cases on which respondents rely: the excluded member had been previously expelled. Moreover, Walpole was excluded only for the remainder of the Parliament from which he had been expelled. "The theory seems to have been that expulsion lasted as long as the parliament . . . ." Taswell-Langmead, *supra,* at 584, n. 99. Accord, 1 W. Blackstone's Commentaries *176. Thus, Walpole's exclusion justifies only the proposition that an expulsion lasted for the remainder of the particular Parliament, and the expelled member was therefore subject to subsequent exclusion if re-elected prior to the next general election. The two colonial cases arguably support a somewhat broader principle, *i. e.,* that the assembly could permanently expel. Apparently the colonies did not consistently adhere to the theory that an expulsion lasted only until the election of a new assembly. M. Clarke, Parliamentary Privilege in the American Colonies 196–202 (1943).[52] Clearly, however, none of these cases supports respondents' contention that by the 18th century the English Parliament

---

was re-elected twice in 1760 and excluded on both occasions; however, when he was elected at the 1761 general elections, he was allowed to take his seat. 5 Colonial Records of North Carolina 1057–1058 (1887); 6 *id.,* at 375, 474, 662–663, 672–673 (1888). There may have been similar exclusions of two men elected in 1710 to the New Jersey Assembly. See Clarke, *supra,* at 197–198.

[52] Significantly, the occasional assumption of this broader expulsion power did not go unchallenged, Clarke, *supra,* at 196–202; and it was not supported by the only parliamentary precedent, the Walpole case.

and colonial assemblies had assumed absolute discretion to exclude any member-elect they deemed unfit to serve. Rather, they seem to demonstrate that a member could be excluded only if he had first been expelled.

Even if these cases could be construed to support respondents' contention, their precedential value was nullified prior to the Constitutional Convention. By 1782, after a long struggle, the arbitrary exercise of the power to exclude was unequivocally repudiated by a House of Commons resolution which ended the most notorious English election dispute of the 18th century—the John Wilkes case. While serving as a member of Parliament in 1763, Wilkes published an attack on a recent peace treaty with France, calling it a product of bribery and condemning the Crown's ministers as " 'the tools of despotism and corruption.' " R. Postgate, That Devil Wilkes 53 (1929). Wilkes and others who were involved with the publication in which the attack appeared were arrested.[53] Prior to Wilkes' trial, the House of Commons expelled him for publishing "a false, scandalous, and seditious libel." 15 Parl. Hist. Eng. 1393 (1764). Wilkes then fled to France and was subsequently sentenced to exile. 9 L. Gipson, The British Empire Before the American Revolution 37 (1956).

Wilkes returned to England in 1768, the same year in which the Parliament from which he had been expelled was dissolved. He was elected to the next Parliament, and he then surrendered himself to the Court of King's Bench. Wilkes was convicted of seditious libel and sentenced to 22 months' imprisonment. The new Parlia-

---

[53] Pursuant to a general warrant, Wilkes was arrested, his home ransacked, and his private papers seized. In his later election campaigns, Wilkes denounced the use of general warrants, asserting that he was fighting for liberty itself. See 11 L. Gipson, The British Empire Before the American Revolution 213–214 (1965).

528

ment declared him ineligible for membership and ordered that he be "expelled this House." 16 Parl. Hist. Eng. 545 (1769). Although Wilkes was re-elected to fill the vacant seat three times, each time the same Parliament declared him ineligible and refused to seat him. See 11 Gipson, *supra,* at 207–215.[54]

Wilkes was released from prison in 1770 and was again elected to Parliament in 1774. For the next several years, he unsuccessfully campaigned to have the resolutions expelling him and declaring him incapable of re-election expunged from the record. Finally, in 1782, the House of Commons voted to expunge them, resolving that the prior House actions were "subversive of the rights of the whole body of electors of this kingdom." 22 Parl. Hist. Eng. 1411 (1782).

With the successful resolution of Wilkes' long and bitter struggle for the right of the British electorate to be represented by men of their own choice, it is evident that, on the eve of the Constitutional Convention, English precedent stood for the proposition that "the law of the land had regulated the qualifications of members to serve in parliament" and those qualifications were "not occasional but fixed." 16 Parl. Hist. Eng. 589, 590 (1769). Certainly English practice did not support, nor had it ever supported, respondents' assertion that the power to judge qualifications was generally understood to encompass the right to exclude members-elect for general misconduct not within standing qualifications. With the repudiation in 1782 of the only two precedents

[54] The issue before the Commons was clear: Could the Commons "put in any disqualification, that is not put in by the law of the land." 1 H. Cavendish's Debates 384 (J. Wright ed. 1841). The affirmative answer was somewhat less than resounding. After Wilkes' third re-election, the motion to seat his opponent carried 197 to 143.

for excluding a member-elect who had been previously expelled,[55] it appears that the House of Commons also repudiated any "control over the eligibility of candidates, except in the administration of the laws which define their [standing] qualifications." T. May's Parliamentary Practice 66 (13th ed. T. Webster 1924). See Taswell-Langmead, *supra,* at 585.[56]

The resolution of the Wilkes case similarly undermined the precedential value of the earlier colonial exclusions, for the principles upon which they had been based were repudiated by the very body the colonial assemblies sought to imitate and whose precedents they generally followed. See Clarke, *supra,* at 54, 59–60, 196. Thus, in 1784 the Council of Censors of the Pennsylvania Assembly [57] denounced the prior expulsion of an unnamed assemblyman, ruling that his expulsion had not been effected in conformity with the recently enacted Pennsylvania Constitution.[58] In the course of its report, the

[55] The validity of the House's action against Wilkes rested to a large extent on the validity of the Walpole precedent. Taswell-Langmead, *supra,* at 585. Thus, the House of Commons resolution expunging, as subversive to the rights of the whole electorate, the action taken against Wilkes was also a tacit repudiation of the similar action taken against Walpole in 1712.

[56] English law is apparently the same today. See T. May's Parliamentary Practice 105–108 (17th ed. B. Cocks 1964).

[57] The Council of Censors was established by the 1776 Pennsylvania Constitution. It was an elected body that was specifically charged with the duty "to enquire whether the constitution has been preserved inviolate in every part; and whether the legislative and executive branches of government have performed their duty as guardians of the people, or assumed to themselves, or exercised other or greater powers than they are intitled to by the constitution." Pa. Const. of 1776, § 47, 5 Thorpe 3091. See Pennsylvania Convention Proceedings: 1776 and 1790, Introduction, p. IV (1825).

[58] In discussing the case, respondents characterize the earlier action as an *exclusion.* The Council of Censors, however, stated that the

Council denounced by name the Parliamentary exclusions of both Walpole and Wilkes, stating that they "reflected dishonor on none but the authors of these violences." Pennsylvania Convention Proceedings: 1776 and 1790, p. 89 (1825).

Wilkes' struggle and his ultimate victory had a significant impact in the American colonies. His advocacy of libertarian causes [59] and his pursuit of the right to be

general assembly had resolved that the member "is expelled from his seat." Pennsylvania Convention Proceedings, *supra,* at 89. The account of the dissenting committee members suggests that the term expulsion was properly used. They note that in February 1783 the assembly received a letter from the Comptroller General charging the assemblyman with fraud. Not until September 9, 1783, did the assembly vote to expel him. Presumably, he held his seat until that time. But, even if he had been excluded, arguably he was excluded for not meeting a standing incapacity, since the *Pennsylvania Constitution of 1776* required assemblymen to be "most noted for wisdom and *virtue."* Pa. Const. of 1776, § 7, 5 Thorpe 3084. (Emphasis added.) In fact, the dissenting members of the Committee argued that the expelled member was ineligible under this very provision. Pennsylvania Convention Proceedings, *supra,* at 89.

Respondents cite one other exclusion during the period between the Declaration of Independence and the Constitutional Convention 11 years later. In 1780 the Virginia Assembly excluded John Breckenridge because he was a minor. Minority, of course, was a traditional standing incapacity, and Charles Warren therefore appears to have been correct in concluding that this exclusion was probably based upon an interpretation of the state constitutional requirement that members must be duly qualified according to law. Va. Const., 7 Thorpe 3816. See C. Warren, The Making of the Constitution 423, n. 1 (1928). Respondents, based upon their misinterpretation of the Pennsylvania case just discussed, criticize Charles Warren for concluding that there had been only one exclusion during this period. Our research, however, has disclosed no other cases.

[59] Wilkes had established a reputation both in England and the Colonies as a champion of free elections, freedom from arbitrary

seated in Parliament became a *cause célèbre* for the colonists. "[T]he cry of 'Wilkes and Liberty' echoed loudly across the Atlantic Ocean as wide publicity was given to every step of Wilkes's public career in the colonial press . . . . The reaction in America took on significant proportions. Colonials tended to identify their cause with that of Wilkes. They saw him as a popular hero and a martyr to the struggle for liberty. . . . They named towns, counties, and even children in his honour." 11 Gipson, *supra,* at 222.[60] It is within this historical context that we must examine the Convention debates in 1787, just five years after Wilkes' final victory.

---

arrest and seizure, and freedom of the press. See 11 Gipson, *supra,* at 191–222.

[60] See R. Postgate, That Devil Wilkes 171–172, 173–174 (1929). During the House of Commons debates in 1781, a member remarked that expelling Wilkes had been "one of the great causes which had separated . . . [England] from America." 22 Parl. Hist. Eng. 100–101 (1781).

The writings of the pamphleteer "Junius" were widely reprinted in colonial newspapers and lent considerable support to the revolutionary cause. See 3 Dictionary of American History 190 (1940). Letter XVIII of the "Letters of Junius" bitterly attacked the exclusion of Wilkes. This letter, addressed to Blackstone, asserted:

"You cannot but know, sir, that what was Mr. Wilkes's case yesterday may be yours or mine to-morrow, and that, consequently the common right of every subject of the realm is invaded by it. . . . If the expulsion of a member, not under any legal disability, of itself creates in him an incapacity to be elected, I see a ready way marked out, by which the majority may, at any time, remove the honestest and ablest men who happen to be in opposition to them. To say that they will not make this extravagant use of their power would be a language unfit for a man so learned in the laws as you are. By your doctrine, sir, they have the power: and laws, you know, are intended to guard against what men may do, not to trust to what they will do." 1 Letters of Junius, Letter XVIII, p. 118 (1821).

### b. Convention Debates.

Relying heavily on Charles Warren's analysis [61] of the Convention debates, petitioners argue that the proceedings manifest the Framers' unequivocal intention to deny either branch of Congress the authority to add to or otherwise vary the membership qualifications expressly set forth in the Constitution. We do not completely agree, for the debates are subject to other interpretations. However, we have concluded that the records of the debates, viewed in the context of the bitter struggle for the right to freely choose representatives which had recently concluded in England and in light of the distinction the Framers made between the power to expel and the power to exclude, indicate that petitioners' ultimate conclusion is correct.

The Convention opened in late May 1787. By the end of July, the delegates adopted, with a minimum of debate, age requirements for membership in both the Senate and the House. The Convention then appointed a Committee of Detail to draft a constitution incorporating these and other resolutions adopted during the preceding months. Two days after the Committee was appointed, George Mason, of Virginia, moved that the Committee consider a clause " 'requiring certain qualifications of landed property & citizenship' " and disqualifying from membership in Congress persons who had unsettled accounts or who were indebted to the United States. 2 Farrand 121. A vigorous debate ensued. Charles Pinckney and General Charles C. Pinckney, both of South Carolina, moved to extend these incapacities to both the judicial and executive branches of the new government. But John Dickinson, of Delaware, opposed the inclusion of any statement of qualifications in the Constitution. He argued that it would be "im-

---

[61] See Warren, *supra*, at 399–426.

possible to make a compleat one, and a partial one would by implication tie up the hands of the Legislature from supplying the omissions." *Id.,* at 123.[62] Dickinson's argument was rejected; and, after eliminating the disqualification of debtors and the limitation to "landed" property, the Convention adopted Mason's proposal to instruct the Committee of Detail to draft a property qualification. *Id.,* at 116–117.

The Committee reported in early August, proposing no change in the age requirement; however, it did recommend adding citizenship and residency requirements for membership. After first debating what the precise requirements should be, on August 8, 1787, the delegates unanimously adopted the three qualifications embodied in Art. I, § 2. *Id.,* at 213.[63]

On August 10, the Convention considered the Committee of Detail's proposal that the "Legislature of the United States shall have authority to establish such uniform qualifications of the members of each House, with regard to property, as to the said Legislature shall seem expedient." *Id.,* at 179. The debate on this proposal discloses much about the views of the Framers on the issue of qualifications. For example, James Madison urged its rejection, stating that the proposal would vest

"an improper & dangerous power in the Legislature. The qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution. If the Legislature

---

[62] Dickinson also said that a built-in veneration for wealth would be inconsistent with the republican ideal that merit alone should determine who holds the public trust. 2 Farrand 123.

[63] On August 10, a delegate moved to reconsider the citizenship qualification. The delegate proposed to substitute a three-year requirement for the seven-year requirement already agreed upon. The motion passed. *Id.,* at 251. However, when this proposal was considered on August 13, it was rejected. *Id.,* at 265–266.

could regulate those of either, it can by degrees subvert the Constitution. A Republic may be converted into an aristocracy or oligarchy as well by limiting the number capable of being elected, as the number authorised to elect. . . . It was a power also, which might be made subservient to the views of one faction agst. another. Qualifications founded on artificial distinctions may be devised, by the stronger in order to keep out partizans of [a weaker] faction." *Id.*, at 249–250.[64]

Significantly, Madison's argument was not aimed at the imposition of a property qualification as such, but rather at the delegation to the Congress of the discretionary power to establish any qualifications. The parallel between Madison's arguments and those made in Wilkes' behalf is striking.[65]

---

[64] Charles Pinckney proposed that the President, judges, and legislators of the United States be required to swear that they possessed a specified amount of unincumbered property. Benjamin Franklin expressed his strong opposition, observing that "[s]ome of the greatest rogues he was ever acquainted with, were the richest rogues." *Id.*, at 249. He voiced the fear that a property requirement would "discourage the common people from removing to this Country." *Ibid.* Thereafter, "the Motion of Mr. Pinkney [*sic*] was rejected by so general a *no*, that the States were not called." *Ibid.* (Emphasis in original.)

[65] "That the right of the electors to be represented by men of their own choice, was so essential for the preservation of all their other rights, that it ought to be considered as one of the most sacred parts of our constitution. . . . That the law of the land had regulated the qualifications of members to serve in parliament, and that the freeholders . . . had an indisputable right to return whom they thought proper, provided he was not disqualified by any of those known laws. . . . They are not occasional but fixed: to rule and govern the question as it shall arise; not to start up on a sudden, and shift from side to side, as the caprice of the day or the fluctuation of party shall direct." *16 Parl. Hist. Eng. 589–590* (1769).

In view of what followed Madison's speech, it appears that on this critical day the Framers were facing and then rejecting the possibility that the legislature would have power to usurp the "indisputable right [of the people] to return whom they thought proper" [66] to the legislature. Oliver Ellsworth, of Connecticut, noted that a legislative power to establish property qualifications was exceptional and "dangerous because it would be much more liable to abuse." *Id.*, at 250. Gouverneur Morris then moved to strike "with regard to property" from the Committee's proposal. His intention was "to leave the Legislature entirely at large." *Ibid.* Hugh Williamson, of North Carolina, expressed concern that if a majority of the legislature should happen to be "composed of any particular description of men, of lawyers for example, . . . the future elections might be secured to their own body." *Ibid.*[67] Madison then referred to the British Parliament's assumption of the power to regulate the qualifications of both electors and the elected and noted that "the abuse they had made of it was a lesson worthy of our attention. They had made the changes in both cases subservient to their own views, or to the views of political or Religious parties." *Ibid.*[68] Shortly thereafter,

---

[66] *Id.*, at 589.

[67] Wilkes had made essentially the same argument in one of his early attempts to have the resolutions denying him a seat expunged:

"This usurpation, if acquiesced under, would be attended with the most alarming consequences. If you can reject those disagreeable to a majority, and expel whom you please, the House of Commons will be self-created and self-existing. You may expel till you approve, and thus in effect you nominate. The original idea of this House being the representative of the Commons of the realm will be lost." 18 Parl. Hist. Eng. 367 (1775).

[68] Charles Warren concluded that "Madison's reference was undoubtedly to the famous election case of John Wilkes . . . ." Warren, *supra*, at 420, n. 1. It is also possible, however, that he was referring to the Parliamentary Test Act, 30 Car. 2, Stat. 2,

the Convention rejected both Gouverneur Morris' motion and the Committee's proposal. Later the same day, the Convention adopted without debate the provision authorizing each House to be "the judge of the . . . qualifications of its own members." *Id.,* at 254.

One other decision made the same day is very important to determining the meaning of Art. I, § 5. When the delegates reached the Committee of Detail's proposal to empower each House to expel its members, Madison "observed that the right of expulsion . . . was too important to be exercised by a bare majority of a quorum: and in emergencies [one] faction might be dangerously abused." *Id.,* at 254. He therefore moved that "with the concurrence of two-thirds" be inserted. With the exception of one State, whose delegation was divided, the motion was unanimously approved without debate, although Gouverneur Morris noted his opposition. The importance of this decision cannot be over-emphasized. None of the parties to this suit disputes that prior to 1787 the legislative powers to judge qualifications and to expel were exercised by a majority vote. Indeed, without exception, the English and colonial antecedents to Art. I, § 5, cls. 1 and 2, support this conclusion. Thus, the Convention's decision to increase the vote required to expel, because that power was "too important to be exercised by a bare majority," while at the same time not similarly restricting the power to judge qualifications, is compelling evidence that they considered the latter already limited by the standing qualifications previously adopted.[69]

---

c. 1 (1678), which had excluded Catholics as a group from serving in Parliament.

[69] Charles Warren, upon whose interpretation of these events petitioners rely, concluded that the Convention's decision to reject Gouverneur Morris' proposal and the more limited proposal of the Committee of Detail was an implicit adoption of Madison's

Respondents urge, however, that these events must be considered in light of what they regard as a very significant change made in Art. I, § 2, cl. 2, by the Committee of Style. When the Committee of Detail reported the provision to the Convention, it read:

> "Every member of the House of Representatives shall be of the age of twenty five years at least; shall have been a citizen of [in] the United States for at least three years before his election; and shall be, at the time of his election, a resident of the State in which he shall be chosen." *Id.,* at 178.

However, as finally drafted by the Committee of Style, these qualifications were stated in their present negative form. Respondents note that there are no records of the "deliberations" of the Committee of Style. Nevertheless, they speculate that this particular change was designed to make the provision correspond to the form used by Blackstone in listing the "standing incapacities" for membership in the House of Commons. See 1 W. Blackstone's Commentaries *175–176. Blackstone, who was an apologist for the anti-Wilkes forces in Parlia-

---

position that the qualifications of the elected "were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution." 2 Farrand 249–250. See Warren, *supra,* at 420–421. Certainly, Warren argued, "[s]uch action would seem to make it clear that the Convention did not intend to grant to a single branch of Congress . . . the right to establish any qualifications for its members, other than those qualifications established by the Constitution itself . . . . For certainly it did not intend that a single branch of Congress should possess a power which the Convention had expressly refused to vest in the whole Congress." *Id.,* at 421. See 1 J. Story, Commentaries on the Constitution of the United States § 625, at 445 (1873). Although Professor Chafee argued that congressional precedents do not support this construction, he nevertheless stated that forbidding any additions to the qualifications expressed in the Constitution was "the soundest policy." Z. Chafee, Free Speech in the United States 256 (1941).

ment,[70] had added to his Commentaries after Wilkes' exclusion the assertion that individuals who were not ineligible for the Commons under the standing incapacities could still be denied their seat if the Commons deemed them unfit for other reasons.[71] Since Blackstone's Commentaries was widely circulated in the Colonies, respondents further speculate that the Committee of Style rephrased the qualifications provision in the negative to clarify the delegates' intention "only to prescribe the standing incapacities without imposing any other limit on the historic power of each house to judge qualifications on a case by case basis." [72]

Respondents' argument is inherently weak, however, because it assumes that legislative bodies historically possessed the power to judge qualifications on a case-by-case basis. As noted above, the basis for that conclusion was the Walpole and Wilkes cases, which, by the time of the Convention, had been denounced by the House of Commons and repudiated by at least one State government. Moreover, respondents' argument misrepresents the function of the Committee of Style. It was appointed only "to revise the stile of and arrange the articles which had been agreed to . . . ." 2 Farrand 553.

[70] See 10 W. Holdsworth, A History of English Law 540–542 (1938).

[71] Holdsworth notes that in the first edition of Blackstone's Commentaries Blackstone enumerated various incapacities and then concluded that "subject to these standing restrictions and disqualifications, every subject of the realm is eligible [for membership in the House of Commons] of common right." 1 W. Blackstone's Commentaries *176. Blackstone was called upon in Commons to defend Wilkes' exclusion and the passage was quoted against him. Blackstone retaliated by writing a pamphlet and making two additions to later editions of his Commentaries in an effort to justify the decision of Parliament. Holdsworth, *supra,* at 540–541.

[72] Appendix D to Brief for Respondents 52.

"[T]he Committee . . . had no authority from the Convention to make alterations of substance in the Constitution as voted by the Convention, nor did it purport to do so; and certainly the Convention had no belief . . . that any important change was, in fact, made in the provisions as to qualifications adopted by it on August 10." [73]

Petitioners also argue that the post-Convention debates over the Constitution's ratification support their interpretation of § 5. For example, they emphasize Hamilton's reply to the antifederalist charge that the new Constitution favored the wealthy and well-born:

"The truth is that there is no method of securing to the rich the preference apprehended but by prescribing qualifications of property either for those who may elect or be elected. But this forms no part of the power to be conferred upon the national government. Its authority would be expressly restricted to the regulation of the *times,* the *places,* the *manner* of elections. *The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature."* The Federalist Papers 371 (Mentor ed. 1961). (Emphasis in last sentence added.)

---

[73] Warren, *supra,* at 422, n. 1. Charles Warren buttressed his conclusion by noting that the Massachusetts Constitution of 1780 "contained affirmative qualifications for Representatives and exactly similar negative qualifications for Senators." *Ibid.* Apparently, these provisions were not considered substantively different, for each house was empowered in identical language to "judge of the elections, returns and qualifications of their own members, *as pointed out in the constitution."* Mass. Const., pt. 2, c. I, § 2, Art. IV, 3 Thorpe 1897, and § 3, Art. X, 3 Thorpe 1899. (Emphasis added.) See Warren, *supra,* at 422–423, n. 1.

Madison had expressed similar views in an earlier essay,[74] and his arguments at the Convention leave no doubt about his agreement with Hamilton on this issue.

Respondents counter that Hamilton was actually addressing himself to criticism of Art. I, § 4, which authorizes Congress to regulate the times, places, and manner of electing members of Congress. They note that prominent antifederalists had argued that this power could be used to "confer on the rich and *well-born,* all honours." Brutus No. IV, N. Y. Journal, Nov. 29, 1787, p. 7. (Emphasis in original.) Respondents' contention, however, ignores Hamilton's express reliance on the immutability of the qualifications set forth in the Constitution.[75]

The debates at the state conventions also demonstrate the Framers' understanding that the qualifications for members of Congress had been fixed in the Constitution. Before the New York convention, for example, Hamilton emphasized: "[T]he true principle of a republic is, that

---

[74] In No. 52 of The Federalist, Madison stated:

"The qualifications of the elected, being less carefully and properly defined by the State constitutions, and being at the same time more susceptible of uniformity, have been very properly considered and regulated by the convention. [He then enumerated the qualifications for both representatives and Senators.] . . . Under these reasonable limitations, the door of this part of the federal government is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession or religious faith." The Federalist Papers 326 (Mentor ed. 1961).

[75] Respondents dismiss Madison's assertion that the "qualifications of the elected, . . . being at the same time more susceptible of uniformity, have been very properly considered and regulated by the convention," as nothing more than a refutation of the charge that the new national legislature would be free to establish additional "standing incapacities." However, this conclusion cannot be reconciled with the pre-Convention history on this question, the Convention debates themselves, and, in particular, the delegates' decision to require a two-thirds vote for expulsion.

the people should choose whom they please to govern them. Representation is imperfect in proportion as the current of popular favor is checked. This great source of free government, popular election, should be perfectly pure, and the most unbounded liberty allowed." 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876) (hereinafter cited as Elliot's Debates).[76] In Virginia, where the Federalists faced powerful opposition by advocates of popular democracy, Wilson Carey Nicholas, a future member of both the House and Senate and later Governor of the State, met the arguments that the new Constitution violated democratic principles with the following interpretation of Art. I, § 2, cl. 2, as it respects the qualifications of the elected: "It has ever been considered a great security to liberty, that very few should be excluded from the right of being chosen to the legislature. This Constitution has amply attended to this idea. We find no qualifications required except those of age and residence, which create a certainty of their judgment being matured, and of being attached to their state." 3 Elliot's Debates 8.

## c. Post-Ratification.

As clear as these statements appear, respondents dismiss them as "general statements . . . directed to other issues." [77] They suggest that far more relevant is Congress' own understanding of its power to judge qualifications as manifested in post-ratification exclusion cases. Unquestionably, both the House and the Senate have excluded members-elect for reasons other than their

---

[76] At the same convention, Robert Livingston, one of the new Constitution's most ardent supporters and one of the State's most substantial landowners, endorsed this same fundamental principle: "The people are the best judges who ought to represent them. To dictate and control them, to tell them whom they shall not elect, is to abridge their natural rights." 2 Elliot's Debates 292–293.

[77] Appendix D to Brief for Respondents 62.

failure to meet the Constitution's standing qualifications. For almost the first 100 years of its existence, however, Congress strictly limited its power to judge the qualifications of its members to those enumerated in the Constitution.

Congress was first confronted with the issue in 1807,[78] when the eligibility of William McCreery was challenged because he did not meet additional residency requirements imposed by the State of Maryland. In recommending that he be seated, the House Committee of Elections reasoned:

> "The committee proceeded to examine the Constitution, with relation to the case submitted to them, and find that qualifications of members are therein determined, without reserving any authority to the State Legislatures to change, add to, or diminish those qualifications; and that, by that instrument, Congress is constituted the sole judge of the qualifications prescribed by it, and are obliged to decide agreeably to the Constitutional rules . . . ." 17 Annals of Cong. 871 (1807).

Lest there be any misunderstanding of the basis for the committee's recommendation, during the ensuing debate the chairman explained the principles by which the committee was governed:

> "The Committee of Elections considered the qualifications of members to have been unalterably de-

---

[78] In 1797, during the 5th Congress, 1st Session, the House considered expelling Matthew Lyon, a Republican, for sedition. The vote to expel, however, was 49 to 45, and broke down largely along partisan lines. Although Lyon's opponents, the Federalists, retained a majority in the 6th Congress, to which Lyon was re-elected, and although there were political advantages to be gained from trying to prevent him from taking his seat, there was no effort made to exclude him. See Dionisopoulos, A Commentary on the Constitutional Issues in the Powell and Related Cases, 17 J. Pub. L. 103, 123–127 (1968).

termined by the Federal Convention, unless changed by an authority equal to that which framed the Constitution at first; that neither the State nor the Federal Legislatures are vested with authority to add to those qualifications, so as to change them. . . . Congress, by the Federal Constitution, are not authorized to prescribe the qualifications of their own members, but they are authorized to judge of their qualifications; in doing so, however, they must be governed by the rules prescribed by the Federal Constitution, and by them only. These are the principles on which the Election Committee have made up their report, and upon which their resolution is founded." *Id.,* at 872.

The chairman emphasized that the committee's narrow construction of the power of the House to judge qualifications was compelled by the "fundamental principle in a free government," *id.,* at 873, that restrictions upon the people to choose their own representatives must be limited to those "absolutely necessary for the safety of the society." *Id.,* at 874. At the conclusion of a lengthy debate, which tended to center on the more narrow issue of the power of the States to add to the standing qualifications set forth in the Constitution, the House agreed by a vote of 89 to 18 to seat Congressman McCreery. *Id.,* at 1237. See 1 A. Hinds, Precedents of the House of Representatives of the United States § 414 (1907) (hereinafter cited as Hinds).

There was no significant challenge to these principles for the next several decades.[79] They came under heavy

---

[79] Another Maryland representative was unsuccessfully challenged in 1808 on grounds almost identical to those asserted in the challenge of McCreery. See 18 Annals of Cong. 1848–1849 (1808). In 1844, the Senate declined to exclude John M. Niles, who was accused of being mentally incompetent, after a special committee reported him competent. Cong. Globe, 28th Cong., 1st Sess., 564–565, 602 (1844). In 1856, the House rejected an attempt to exclude Samuel

attack, however, "during the stress of civil war [but initially] the House of Representatives declined to exercise the power [to exclude], even under circumstances of great provocation." [80] Rules of the House of Representatives, H. R. Doc. No. 529, 89th Cong., 2d Sess., § 12, p. 7 (1967). The abandonment of such restraint, however, was among the casualties of the general upheaval produced in war's wake. In 1868, the House voted for the first time in its history to exclude a member-elect. It refused to seat two duly elected representatives for giving aid and comfort to the Confederacy. See 1 Hinds §§ 449–451.[81] "This change was produced by the North's bitter enmity toward those who failed to support the Union cause during the war, and was effected by the Radical Republican domination of Congress. It was a shift brought about by the naked urgency of power and was given little doctrinal support." Comment, Legislative Exclusion: Julian Bond and Adam Clayton Powell, 35 U. Chi. L. Rev. 151, 157 (1967).[82] From that time until

---

Marshall for violating an Illinois law prohibiting state judges from running for other offices. 1 Hinds § 415. That same year, the Senate refused to exclude Lyman Trumbull for violating the same Illinois law. *Ibid.*

[80] Between 1862 and 1867, both the House and Senate resisted several attempts to exclude members-elect who were accused of being disloyal to the Union during the Civil War. See, *id.*, §§ 448, 455, 458; Senate Election, Expulsion and Censure Cases, S. Doc. No. 71, 87th Cong., 2d Sess., 21 (1962) (hereinafter cited as Senate Cases).

[81] That same year the Senate also excluded a supporter of the Confederacy. Senate Cases 40. The House excluded two others shortly thereafter, one for the same offense, and another for selling appointments to the Military and Naval Academies. See 1 Hinds §§ 459, 464; 2 Hinds § 1273.

[82] This departure from previous House construction of its power to exclude was emphasized by Congressman William P. Fessenden: "[T]he power which we have under the Constitution to judge of the

the present, congressional practice has been erratic;[83] and on the few occasions when a member-elect was excluded although he met all the qualifications set forth in the

qualifications of members of the body is not a mere arbitrary power, to be exerted according to the will of the individuals who may vote upon the subject. It ought to be a power subject to certain rules and founded upon certain principles. So it was up to a very late period, until the rebellion. The rule simply was, if a man came here and presented proper credentials from his State, to allow him to take the ordinary oath, which we all took, to support the Constitution, and be admitted, and if there was any objection to him to try that question afterward." Cong. Globe, 40th Cong., 2d Sess., 685 (1868).

[83] For example, in 1870, the House refused to exclude a Texas Congressman accused of a variety of criminal acts, 1 Hinds § 465; but in 1882 and again in 1900 the House excluded a member-elect for practicing polygamy. 1 Hinds §§ 473, 477–480. Thereafter, it apparently did not consider excluding anyone until shortly after World War I, when it twice excluded Victor L. Berger, an avowed Socialist, for giving aid and comfort to the enemy. Significantly, the House committee investigating Berger concluded that he was ineligible under the express provision of § 3 of the Fourteenth Amendment. 6 C. Cannon, Precedents of the House of Representatives of the United States §§ 56–59 (1935) (hereinafter cited as Cannon). Berger, the last person to be excluded from the House prior to Powell, was later re-elected and finally admitted after his criminal conviction was reversed. 65 Cong. Rec. 7 (1923).

The House next considered the problem in 1925 when it contemplated excluding John W. Langley for his alleged misconduct. Langley resigned after losing a criminal appeal, and the House therefore never voted upon the question. 6 Cannon § 238. The most recent exclusion attempt prior to Powell's occurred in 1933, when the House refused to exclude a Representative from Minnesota who had been convicted of sending defamatory matter through the mail. See 77 Cong. Rec. 73–74, 131–139 (1933).

The Senate has not excluded anyone since 1929; in that year it refused to seat a member-elect because of improper campaign expenditures. 6 Cannon § 180. In 1947, a concerted effort was made to exclude Senator Theodore G. Bilbo of Mississippi for allegedly accepting gifts from war contractors and illegally intimidating Negroes in Democratic primaries. See 93 Cong. Rec. 3–28 (1947). He died, however, before a decision was reached.

Constitution, there were frequently vigorous dissents.[84] Even the annotations to the official manual of procedure for the 90th Congress manifest doubt as to the House's power to exclude a member-elect who has met the constitutionally prescribed qualifications. See Rules of the House of Representatives, H. R. Doc. No. 529, 89th Cong., 2d Sess., § 12, pp. 7–8 (1967).

Had these congressional exclusion precedents been more consistent, their precedential value still would be quite limited. See Note, The Power of a House of Congress to Judge the Qualifications of its Members, 81 Harv. L. Rev. 673, 679 (1968).[85] That an unconstitu-

---

[84] During the debates over H. R. Res. No. 278, Congressman Celler, chairman of both the Select Committee and the Judiciary Committee, forcefully insisted that the Constitution "unalterably fixes and defines" the qualifications for membership in the House and that any other construction of Art. I, § 5, would be "improper and dangerous." 113 Cong. Rec. 4998. See H. R. Rep. No. 484, 43d Cong., 1st Sess., 11–15 (1874) (views of minority); H. R. Rep. No. 85, 56th Cong., 1st Sess., 53–77 (1900) (views of minority). In the latter report, the dissenters argued: "A small partisan majority might render the desire to arbitrarily exclude, by a majority vote, in order to more securely intrench itself in power, irresistible. Hence its exercise is controlled by legal rules. In case of expulsion, when the requisite two-thirds can be had, the motive for the exercise of arbitrary power no longer exists, as a two-thirds partisan majority is sufficient for every purpose. . . . The power of exclusion is a matter of law, to be exercised by a majority vote, in accordance with legal principles, and exists only where a member-elect lacks some of the qualifications required by the Constitution." *Id.,* at 76–77.

[85] "Determining the basis for a congressional action is itself difficult; since a congressional action, unlike a reported judicial decision, contains no statement of the reasons for the disposition, one must fall back on the debates and the committee reports. If more than one issue is raised in the debates, one can never be sure on what basis the action was predicated. Unlike a court, which is presumed to be disinterested, in an exclusion case the concerned house is in effect a party to the controversy that it must adjudicate. Consequently,

tional action has been taken before surely does not render that same action any less unconstitutional at a later date. Particularly in view of the Congress' own doubts in those few cases where it did exclude members-elect, we are not inclined to give its precedents controlling weight. The relevancy of prior exclusion cases is limited largely to the insight they afford in correctly ascertaining the draftsmen's intent. Obviously, therefore, the precedential value of these cases tends to increase in proportion to their proximity to the Convention in 1787. See *Myers* v. *United States,* 272 U. S. 52, 175 (1926). And, what evidence we have of Congress' early understanding confirms our conclusion that the House is without power to exclude any member-elect who meets the Constitution's requirements for membership.

### d. Conclusion.

Had the intent of the Framers emerged from these materials with less clarity, we would nevertheless have been compelled to resolve any ambiguity in favor of a narrow construction of the scope of Congress' power to exclude members-elect. A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them." 2 Elliot's Debates 257. As Madison pointed out at the Convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself. In apparent agreement with this basic philosophy, the Convention adopted his suggestion limiting the power to expel. To allow essentially that same power to be exercised under the guise of judging qualifications, would be to ignore Madison's warning, borne out in the Wilkes case and some of Con-

---

some members may be inclined to vote for exclusion though they strongly doubt its constitutionality." 81 Harv. L. Rev., at 679.

gress' own post-Civil War exclusion cases, against "vesting an improper & dangerous power in the Legislature." 2 Farrand 249. Moreover, it would effectively nullify the Convention's decision to require a two-thirds vote for expulsion. Unquestionably, Congress has an interest in preserving its institutional integrity, but in most cases that interest can be sufficiently safeguarded by the exercise of its power to punish its members for disorderly behavior and, in extreme cases, to expel a member with the concurrence of two-thirds. In short, both the intention of the Framers, to the extent it can be determined, and an examination of the basic principles of our democratic system persuade us that the Constitution does not vest in the Congress a discretionary power to deny membership by a majority vote.

For these reasons, we have concluded that Art. I, § 5, is at most a "textually demonstrable commitment" to Congress to judge only the qualifications expressly set forth in the Constitution. Therefore, the "textual commitment" formulation of the political question doctrine does not bar federal courts from adjudicating petitioners' claims.

## 2. Other Considerations.

Respondents' alternate contention is that the case presents a political question because judicial resolution of petitioners' claim would produce a "potentially embarrassing confrontation between coordinate branches" of the Federal Government. But, as our interpretation of Art. I, § 5, discloses, a determination of petitioner Powell's right to sit would require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a "lack of the respect due [a] coordinate [branch] of government," nor does it involve an "initial policy determination of a kind clearly for non-

judicial discretion." *Baker* v. *Carr,* 369 U. S. 186, at 217. Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.[86] See *United States* v. *Brown,* 381 U. S. 437, 462 (1965); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 613–614 (1952) (Frankfurter, J., concurring); *Myers* v. *United States,* 272 U. S. 52, 293 (1926) (Brandeis, J., dissenting).

Nor are any of the other formulations of a political question "inextricable from the case at bar." *Baker* v. *Carr, supra,* at 217. Petitioners seek a determination that the House was without power to exclude Powell from the 90th Congress, which, we have seen, requires an interpretation of the Constitution—a determination for which clearly there are "judicially . . . manageable standards." Finally, a judicial resolution of petitioners' claim will not result in "multifarious pronouncements by various departments on one question." For, as we noted in *Baker* v. *Carr, supra,* at 211, it is the responsibility of this Court to act as the ultimate interpreter of the Constitution. *Marbury* v. *Madison,* 1 Cranch 137 (1803). Thus, we conclude that petitioners' claim is not barred by the political question doctrine, and, having determined that the claim is otherwise generally justiciable, we hold that the case is justiciable.

## VII.

### CONCLUSION.

To summarize, we have determined the following: (1) This case has not been mooted by Powell's seating in

---

[86] In fact, the Court has noted that it is an "inadmissible suggestion" that action might be taken in disregard of a judicial determination. *McPherson* v. *Blacker,* 146 U. S. 1, 24 (1892).

the 91st Congress. (2) Although this action should be dismissed against respondent Congressmen, it may be sustained against their agents. (3) The 90th Congress' denial of membership to Powell cannot be treated as an expulsion. (4) We have jurisdiction over the subject matter of this controversy. (5) The case is justiciable.

Further, analysis of the "textual commitment" under Art. I, § 5 (see Part VI, B (1)), has demonstrated that in judging the qualifications of its members Congress is limited to the standing qualifications prescribed in the Constitution. Respondents concede that Powell met these. Thus, there is no need to remand this case to determine whether he was entitled to be seated in the 90th Congress. Therefore, we hold that, since Adam Clayton Powell, Jr., was duly elected by the voters of the 18th Congressional District of New York and was not ineligible to serve under any provision of the Constitution, the House was without power to exclude him from its membership.

Petitioners seek additional forms of equitable relief, including mandamus for the release of petitioner Powell's back pay. The propriety of such remedies, however, is more appropriately considered in the first instance by the courts below. Therefore, as to respondents McCormack, Albert, Ford, Celler, and Moore, the judgment of the Court of Appeals for the District of Columbia Circuit is affirmed. As to respondents Jennings, Johnson, and Miller, the judgment of the Court of Appeals for the District of Columbia Circuit is reversed and the case is remanded to the United States District Court for the District of Columbia with instructions to enter a declaratory judgment and for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS.

While I join the opinion of the Court, I add a few words. As the Court says, the important constitutional question is whether the Congress has the power to deviate from or alter the qualifications for membership as a Representative contained in Art. I, § 2, cl. 2, of the Constitution.[1] Up to now the understanding has been quite clear to the effect that such authority does not exist.[2] To be sure, Art. I, § 5, provides that: "Each

---

[1] U. S. Const., Art. I, § 2, cl. 2:

"No Person shall be a Representative who shall not have attained to the age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen."

[2] The Constitutional Convention had the occasion to consider several proposals for giving Congress discretion to shape its own qualifications for office and explicitly rejected them. James Madison led the opposition by arguing that such discretion would be

"an improper & dangerous power in the Legislature. The qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution. If the Legislature could regulate those of either, it can by degrees subvert the Constitution." 2 M. Farrand, Records of the Federal Convention of 1787, pp. 249–250 (1911).

Alexander Hamilton echoed that same conclusion:

"The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature." The Federalist Papers, No. 60, p. 371 (Mentor ed. 1961).

And so, too, the early Congress of 1807 decided to seat Representative-elect William McCreery on the ground that its power to "judge" was limited by the enumerated qualifications.

"The Committee of Elections considered the qualifications of members to have been unalterably determined by the Federal Convention, unless changed by an authority equal to that which framed the Constitution at first . . . . Congress, by the Federal Constitution, are not authorized to prescribe the qualifications of their own members, but they are authorized to judge of their qualifications; in doing so, however, they must be governed by the rules prescribed

House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . . ." Contests may arise over whether an elected official meets the "qualifications" of the Constitution, in which event the House is the sole judge.[3] But the House is not the sole judge when "qualifications" are added which are not specified in the Constitution.[4]

---

by the Federal Constitution, and by them only." 17 Annals of Cong. 872 (1807) (remarks of Rep. Findley, Chairman of House Committee of Elections).

Constitutional scholars of two centuries have reaffirmed the principle that congressional power to "judge" the qualifications of its members is limited to those enumerated in the Constitution. 1 J. Story, Commentaries on the Constitution 462 (5th ed. 1891); C. Warren, The Making of the Constitution 420–426 (1928). See also remarks by Emmanuel Celler, Chairman of the House Select Committee which inquired into the qualifications of Adam Clayton Powell, Jr., and which recommended seating him:

"The Constitution lays down three qualifications for one to enter Congress—age, inhabitancy, citizenship. Mr. Powell satisfies all three. The House cannot add to these qualifications." 113 Cong. Rec. 4998.

[3] *Baker* v. *Carr*, 369 U. S. 186, 242, n. 2 (Douglas, J., concurring).

[4] The question whether Congress has authority under the Constitution to add to enumerated qualifications for office is itself a federal question within the particular expertise of this Court. *Baker* v. *Carr*, 369 U. S. 186, 211. Where that authority has been exceeded, redress may be properly sought here. *Marbury* v. *Madison*, 1 Cranch 137. Congress itself suspected no less in deciding to exclude Rep. Powell:

"[C]ases may readily be postulated where the action of a House in excluding or expelling a Member may directly impinge upon rights under other provisions of the Constitution. In such cases, the unavailability of judicial review may be less certain. Suppose, for example, that a Member was excluded or expelled because of his religion or race, contrary to the equal protection clause, or for making an unpopular speech protected by the first amendment . . . . [E]xclusion of the Member-elect on grounds other than age, citizenship, or inhabitancy could raise an equally serious constitutional issue." H. R. Rep. No. 27, 90th Cong., 1st Sess., 30 (1967).

See also 113 Cong. Rec. 4994.

A man is not seated because he is a Socialist or a Communist.[5]

Another is not seated because in his district members of a minority are systematically excluded from voting.[6]

Another is not seated because he has spoken out in opposition to the war in Vietnam.[7]

The possible list is long. Some cases will have the racist overtones of the present one.

Others may reflect religious or ideological clashes.[8]

At the root of all these cases, however, is the basic integrity of the electoral process. Today we proclaim the constitutional principle of "one man, one vote." When that principle is followed and the electors choose a person who is repulsive to the Establishment in Congress, by what constitutional authority can that group of electors be disenfranchised?

By Art. I, § 5, the House may "expel a Member" by a vote of two-thirds. And if this were an expulsion case I would think that no justiciable controversy would be presented, the vote of the House being two-thirds or more. But it is not an expulsion case. Whether it could have been won as an expulsion case, no one knows. Expulsion for "misconduct" may well raise different questions, different considerations. Policing the conduct of members, a recurring problem in the Senate and House as well, is quite different from the initial decision whether an elected official should be seated. It well might be easier to bar admission than to expel one already seated.

The House excluded Representative-elect Powell from the 90th Congress allegedly for misappropriating public funds and for incurring the contempt of New York

[5] Case of Victor Berger, 6 C. Cannon, Precedents of the House of Representatives of the United States § 56 (1935).

[6] *Id.*, at § 122.

[7] See, *e. g., Bond* v. *Floyd*, 385 U. S. 116.

[8] 1 A. Hinds, Precedents of the House of Representatives of the United States § 481 (1907).

courts.[9]   Twenty-six years earlier, members of the upper chamber attempted to exclude Senator-elect William Langer of North Dakota for like reasons.[10]   Langer first became State's Attorney for Morton County, North Dakota, from 1914 to 1916, and then served as State Attorney General from 1916 to 1920.   He became Governor of the State in 1932 and took office in January 1933. In 1934 he was indicted for conspiring to interfere with the enforcement of federal law by illegally soliciting political contributions from federal employees, and suit was filed in the State Supreme Court to remove him from office.[11]   While that suit was pending, he called the State Legislature into special session.[12]   When it became clear that the court would order his ouster, he signed a Declaration of Independence, invoked martial law, and called out the National Guard.[13]   Nonetheless, when his own officers refused to recognize him as the legal head of state, he left office in July 1934.   As with Adam Clayton Powell, however, the people of the State still wanted him.   In 1937 they re-elected him Governor and, in 1940, they sent him to the United States Senate.

During the swearing-in ceremonies, Senator Barkley drew attention to certain complaints filed against Langer by citizens of North Dakota, yet asked that he be allowed to take the oath of office

> "without prejudice, which is a two-sided proposition—without prejudice to the Senator and without

---

[9] 113 Cong. Rec. 4997.

[10] S. Doc. No. 71 on Senate Election, Expulsion and Censure Cases from 1789 to 1960, 87th Cong., 2d Sess., 140 (1962).

[11] Hearings on A Protest to the Seating of William Langer, before the Senate Committee on Privileges and Elections, 77th Cong., 1st Sess., 820 (Nov. 3, 18, 1941) (hereinafter Hearings).

[12] Hearings 821.

[13] Hearings 820.

prejudice to the Senate in the exercise of its right [to exclude him]." [14]

The matter of Langer's qualifications to serve in the Senate was referred to committee which held confidential hearings on January 9 and 16, 1941, and open hearings on November 3 and 18, 1941. By a vote of 14 to 2, the committee reported that a majority of the Senate had jurisdiction under Art. I, § 5, cl. 1, of the Constitution to exclude Langer; and, by a vote of 13 to 3, it reported its recommendation that Langer not be seated. [15]

The charges against Langer were various. As with Powell, they included claims that he had misappropriated public funds [16] and that he had interfered with the judicial process in a way that beclouded the dignity of Congress. [17] Reference was also made to his professional ethics as a lawyer. [18]

Langer enjoyed the powerful advocacy of Senator Murdock from Utah. The Senate debate itself raged

[14] 87 Cong. Rec. 3–4 (1941).

[15] S. Rep. No. 1010, 77th Cong., 2d Sess. (1942).

[16] It was alleged that he had conspired as Governor to have municipal and county bonds sold to a friend of his who made a profit of $300,000 on the purchase, and purportedly rebated as much as $56,000 to Langer himself. Hearings 822–823.

[17] At the retrial of his conviction for conspiring to interfere with the enforcement of federal law, he was said to have paid money to have a friend of his, Judge Wyman, be given control of the litigation, and to have "meddled" with the jury. Hearings 20–42, 120–130.

[18] He was charged as a lawyer with having accepted $2,000 from the mother of a boy in prison on the promise that he would obtain his pardon, when he knew, in fact, that a pardon was out of the question. He was also said to have counseled a defendant-client of his to marry the prosecution's chief witness in order to prevent her from testifying against him. And finally, it was suggested that he once bought an insurance policy during trial from one of the jurors sitting in judgment of his client. Hearings 820–830.

for over a year.[19]    Much of it related to purely factual allegations of "moral turpitude."    Some of it, however, was addressed to the power of the Senate under Art. I, § 5, cl. 1, to exclude a member-elect for lacking qualifications not enumerated in Art. I, § 3.

"Mr. MURDOCK.    . . . [U]nder the Senator's theory that the Senate has the right to add qualifications which are not specified in the Constitution, does the Senator believe the Senate could adopt a rule specifying intellectual and moral qualifications? [20]

"Mr. LUCAS.    The Senate can do anything it wants to do . . . .    Yes; the Senate can deny a person his seat simply because it does not like the cut of his jaw, if it wishes to." [21]

Senator Murdock argued that the only qualifications for service in the Senate were those enumerated in the Constitution; that Congress had the power to review those enumerated qualifications; but that it could not—while purporting to "judge" those qualifications—in reality add to them.

"Mr. LUCAS.    The Senator referred to article I, section 5.    What does he think the framers of the Constitution meant when they gave to each House the power to determine or to judge the qualifications, and so forth, of its own Members? [22]

"Mr. MURDOCK.    I construe the term 'judge' to mean what it is held to mean in its common, ordinary usage.    My understanding of the definition of the

---

[19] 87 Cong. Rec. 3–4, 460 (1941);  88 Cong. Rec. 822, 828, 1253, 2077, 2165, 2239, 2328, 2382, 2412, 2472, 2564, 2630, 2699, 2759, 2791, 2801, 2842, 2858, 2914, 2917, 2959, 2972, 2989, 3038, 3051, 3065, 5668 (1942).

[20] 88 Cong. Rec. 2401.

[21] *Ibid.*

[22] 88 Cong. Rec. 2474.

word 'judge' as a verb is this: When we judge of a thing it is supposed that the rules are laid out; the law is there for us to look at and to apply to the facts.

"But whoever heard the word 'judge' used as meaning the power to add to what already is the law?" [23]

It was also suggested from the floor that the enumerated qualifications in § 3 were only a *minimum* which the Senate could supplement; and that the Founding Fathers so intended by using words of the negative. To which Senator Murdock replied—

"Mr. President, I think it is the very distinguished and able Senator from Georgia who makes the contention that the constitutional provisions relating to qualifications, because they are stated in the negative—that is, 'no person shall be a Senator'—are merely restrictions or prohibitions on the State; but—and I shall read it later on—when we read what Madison said, when we read what Hamilton said, when we read what the other framers of the Constitution said on that question, there cannot be a doubt as to what they intended and what they meant.[24]

· · · · ·

"Madison knew that the qualifications should be contained in the Constitution and not left to the whim and caprice of the legislature.[25]

· · · · ·

"Bear that in mind, that the positive or affirmative phraseology was not changed to the negative by debate or by amendment in the convention, but it

[23] *Ibid.*
[24] *Ibid.*
[25] 88 Cong. Rec. 2483.

was changed by the committee of which Madison was a member, the committee on style."[26]

The Senate was nonetheless troubled by the suggestion that the Constitution compelled it to accept anyone whom the people might elect, no matter how egregious and even criminal his behavior. No need to worry, said Murdock. It is true that the Senate cannot invoke its majority power to "judge" under Art. I, § 5, cl. 1, as a device for excluding men elected by the people who possess the qualifications enumerated by the Constitution. But it does have the power under Art. I, § 5, cl. 2, to expel anyone it designates by a two-thirds vote. Nonetheless, he urged the Senate not to bypass the two-thirds requirement for expulsion by wrongfully invoking its power to exclude.[27]

> "Mr. LUCAS. ... The position the Senator from Utah takes is that it does not make any difference what a Senator does in the way of crime, that whenever he is elected by the people of his State, comes here with bona fide credentials, and there is no fraud in the election, the Senate cannot refuse to give him the oath. That is the position the Senator takes?
>
> "Mr. MURDOCK. That is my position; yes.[28]
>
> .    .    .    .    .
>
> "My position is that we do not have the right to exclude anyone who comes here clothed with the proper credentials and possessing the constitutional qualifications. My position is that we do not have

---

[26] 88 Cong. Rec. 2484.

[27] Although the House excluded Adam Clayton Powell by over two-thirds vote, it was operating on the assumption that only a majority was needed. For the suggestion that the House could never have rallied the votes to exclude Powell on the basis of a two-thirds ground rule, see Note, 14 How. L. J. 162 (1968); Note, 42 N. Y. U. L. Rev. 716 (1967).

[28] 88 Cong. Rec. 2488.

the right under the provision of the Constitution to which the Senator from Florida referred, to add to the qualifications. My position is that the State is the sole judge of the intellectual and the moral qualifications of the representatives it sends to Congress." [29]

"MR. MURDOCK [quoting Senator Philander Knox]. 'I know of no defect in the plain rule of the Constitution for which I am contending. . . . I cannot see that any danger to the Senate lies in the fact that an improper character cannot be excluded without a two-thirds vote. It requires the unanimous vote of a jury to convict a man accused of crime; it should require, and I believe that it does require, a two-thirds vote to eject a Senator from his position of honor and power, to which he has been elected by a sovereign State.' " [30]

Thus, after a year of debate, on March 27, 1942, the Senate overruled the recommendation of its committee and voted 52 to 30 to seat Langer.

I believe that Senator Murdock stated the correct constitutional principle governing the present case.

MR. JUSTICE STEWART, dissenting.

I believe that events which have taken place since certiorari was granted in this case on November 18, 1968, have rendered it moot, and that the Court should therefore refrain from deciding the novel, difficult, and delicate constitutional questions which the case presented at its inception.

[29] 88 Cong. Rec. 2490.

[30] 88 Cong. Rec. 2488. Senator Knox of Pennsylvania had defended Senator-elect Reed Smoot of Utah in 1903 against charges that he ought to be excluded because of his affiliation with a group (Mormons) that countenanced polygamy. S. Doc. No. 71, 87th Cong., 2d Sess., 97.

I.

The essential purpose of this lawsuit by Congressman Powell and members of his constituency was to regain the seat from which he was barred by the 90th Congress. That purpose, however, became impossible of attainment on January 3, 1969, when the 90th Congress passed into history and the 91st Congress came into being. On that date, the petitioners' prayer for a judicial decree restraining enforcement of House Resolution No. 278 and commanding the respondents to admit Congressman Powell to membership in the 90th Congress became incontestably moot.

The petitioners assert that actions of the House of Representatives of the 91st Congress have prolonged the controversy raised by Powell's exclusion and preserved the need for a judicial declaration in this case. I believe, to the contrary, that the conduct of the present House of Representatives confirms the mootness of the petitioners' suit against the 90th Congress. Had Powell been excluded from the 91st Congress, he might argue that there was a "continuing controversy" concerning the exclusion attacked in this case.[1] And such an argument might be sound even though the present House of Representatives is a distinct legislative body rather than a continuation of its predecessor,[2] and though any griev-

---

[1] See, e. g., United States v. Concentrated Phosphate Export Assn., 393 U. S. 199, 202–204; Carroll v. President and Commissioners of Princess Anne, 393 U. S. 175, 178–179.

[2] See Gojack v. United States, 384 U. S. 702, 707, n. 4 ("Neither the House of Representatives nor its committees are continuing bodies"); McGrain v. Daugherty, 273 U. S. 135, 181. Forty-one of the present members of the House were not members of the 90th Congress; and two of the named defendants in this action, Messrs. Moore and Curtis, are no longer members of the House of Representatives. Moreover, the officer-employees of the House, such as the Sergeant at Arms, are re-elected by each new Congress. See n. 15, infra.

ance caused by conduct of the 91st Congress is not redressable in this action. But on January 3, 1969, the House of Representatives of the 91st Congress admitted Congressman Powell to membership, and he now sits as the Representative of the 18th Congressional District of New York. With the 90th Congress terminated and Powell now a member of the 91st, it cannot seriously be contended that there remains a judicial controversy between these parties over the power of the House of Representatives to exclude Powell and the power of a court to order him reseated. Understandably, neither the Court nor the petitioners advance the wholly untenable proposition that the continuation of this case can be founded on the infinitely remote possibility that Congressman Powell, or any other Representative, may someday be excluded for the same reasons or in the same manner. And because no foreseeable possibility of such future conduct exists, the respondents have met their heavy burden of showing that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States* v. *Concentrated Phosphate Export Assn.,* 393 U. S. 199, 203.[3]

The petitioners further argue that this case cannot be deemed moot because of the principle that "the voluntary abandonment of a practice does not relieve a court of adjudicating its legality . . . ." *Gray* v. *Sanders,* 372

---

[3] See also *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 633; *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 448. The Court has only recently concluded that there was no "controversy" in *Golden* v. *Zwickler,* 394 U. S. 103, because of "the fact that it was most unlikely that the Congressman would again be a candidate for Congress." *Id.,* at 109. It can hardly be maintained that the likelihood of the House of Representatives' again excluding Powell is any greater.

U. S. 368, 376.[4]  I think it manifest, however, that this principle and the cases enunciating it have no application to the present case.   In the first place, this case does not involve "the voluntary abandonment of a practice." Rather it became moot because of an event over which the respondents had no control—the expiration of the 90th Congress.   Moreover, unlike the cases relied on by the petitioners, there has here been no ongoing course of conduct of indefinite duration against which a permanent injunction is necessary.   Thus, it cannot be said of the respondents' actions in this case, as it was of the conduct sought to be enjoined in *Gray,* for example, that "the practice is deeply rooted and long standing," *ibid.,* or that, without judicial relief, the respondents would be "free to return to [their] old ways."   *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632.[5]   Finally, and

---

[4] See also *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632–633; *Local 74, United Bro. of Carpenters & Joiners* v. *NLRB,* 341 U. S. 707, 715; *Walling* v. *Helmerich & Payne, Inc.,* 323 U. S. 37, 43; *Hecht Co.* v. *Bowles,* 321 U. S. 321, 327; *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 307–310.

[5] With the exception of *Gray,* the "continuing controversy" cases relied on by the petitioners were actions by the Government or its agencies to halt illegal conduct of the defendants, and, by example, of others engaged in similar conduct.   See cases cited, *supra,* nn. 1, 3, 4.   The principle that voluntary abandonment of an illegal practice will not make an action moot is especially, if not exclusively, applicable to such public law enforcement suits. "Private parties may settle their controversies at any time, and rights which a plaintiff may have had at the time of the commencement of the action may terminate before judgment is obtained or while the case is on appeal, and in any such case the court, being informed of the facts, will proceed no further in the action. Here, however, there has been no extinguishment of the rights . . . of the public, the enforcement of which the Government has endeavored to procure by a judgment of a court . . . .   The defendants cannot foreclose those rights nor prevent the assertion thereof by the Government as a substantial trustee for the public

most important, the "voluntary abandonment" rule does not dispense with the requirement of a continuing controversy, nor could it under the definition of the judicial power in Article III of the Constitution. Voluntary cessation of unlawful conduct *does* make a case moot "if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" *Id.*, at 633.[6] Since that is the situation here, the case would be moot even if it could be said that it became so by the House's "voluntary abandonment" of its "practice" of excluding Congressman Powell.

The petitioners' proposition that conduct of the 91st Congress has perpetuated the controversy is based on the fact that House Resolution No. 2—the same resolution by which the House voted to seat Powell—fined him $25,000 and provided that his seniority was to commence as of the date he became a member of the 91st Congress.[7] That punishment, it is said, "arises out of the

---

under the act of Congress, by [voluntary cessation of the challenged conduct]." *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S., at 309.

The considerations of public enforcement of a statutory or regulatory scheme which inhere in those cases are not present in this litigation.

[6] Certainly in every decision relied on by the petitioners the Court did not reject the mootness argument solely on the ground that the illegal practice had been voluntarily terminated. In each it proceeded to determine that there was in fact a continuing controversy.

[7] House Resolution No. 2 provided in pertinent part:

"(2) That as punishment Adam Clayton Powell be and he hereby is fined the sum of $25,000, said sum to be paid to the Clerk to be disposed of by him according to law. The Sergeant at Arms of the House is directed to deduct $1,150 per month from the salary otherwise due the said Adam Clayton Powell, and pay the same to said Clerk until said $25,000 fine is fully paid.

"(3) That as further punishment the seniority of the said Adam

prior actions of the House which originally impelled this action." It is indisputable, however, that punishment of a House member involves constitutional issues entirely distinct from those raised by exclusion,[8] and that a punishment in one Congress is in no legal sense a "continuation" of an exclusion from the previous Congress. A judicial determination that the exclusion was improper would have no bearing on the constitutionality of the punishment, nor any conceivable practical impact on Powell's status in the 91st Congress. It is thus clear that the only connection between the exclusion by the 90th Congress and the punishment by the 91st is that they were evidently based on the same asserted derelictions of Congressman Powell. But this action was not brought to exonerate Powell or to expunge the legislative findings of his wrongdoing; its only purpose was to restrain the action taken in consequence of those findings—Powell's exclusion.

Equally without substance is the petitioners' contention that this case is saved from mootness by application of the asserted "principle" that a case challenging allegedly unconstitutional conduct cannot be rendered moot

Clayton Powell in the House of Representatives commence as of the date he takes the oath as a Member of the 91st Congress."

The petitioners' argument that the case is kept alive by Powell's loss of seniority, see *ante,* at 496, is founded on the mistaken assumption that the loss of seniority is attributable to the exclusion from the 90th Congress and that seniority would automatically be restored if that exclusion were declared unconstitutional. But the fact is that Powell was stripped of seniority by the action of the 91st Congress, action which is not involved in this case and which would not be affected by judicial review of the exclusion from the 90th Congress. Moreover, even if the conduct of the 91st Congress were challenged in this case, the Court would clearly have no power whatsoever to pass upon the propriety of such internal affairs of the House of Representatives.

[8] Article I, § 5, of the Constitution specifically empowers each House to "punish its Members for disorderly Behaviour."

by further unconstitutional conduct of the defendants. Under this hypothesis, it is said that the "Court can not determine that the conduct of the House on January 3, 1969, has mooted this controversy without inferentially, at least, holding that the action of the House of that day was legal and constitutionally permissible." If there is in our jurisprudence any doctrine remotely resembling the petitioners' theory—which they offer without reference to any authority—it has no conceivable relevance to this case. For the events of January 3, 1969, that made this case moot were the termination of the 90th Congress and Powell's seating in the 91st, *not* the punishment which the petitioners allege to have been unconstitutional. That punishment is wholly irrelevant to the question of mootness and is in no wise before the Court in this case.

## II.

The passage of time and intervening events have, therefore, made it impossible to afford the petitioners the principal relief they sought in this case. If any aspect of the case remains alive, it is only Congressman Powell's individual claim for the salary of which he was deprived by his absence from the 90th Congress.[9] But even if that claim can be said to prevent this controversy from being moot, which I doubt, there is no need to reach the fundamental constitutional issues that the Court today undertakes to decide.

This Court has not in the past found that an incidental claim for back pay preserves the controversy between a legislator and the legislative body which evicted him, once the term of his eviction has expired. *Alejandrino* v. *Quezon,* 271 U. S. 528, was a case nearly identical to

---

[9] The salary claim is personal to Congressman Powell, and the other petitioners therefore clearly have no further interest in this lawsuit.

that before the Court today. The petitioner was a member of the Senate of the Philippines who had been suspended for one year for assaulting a colleague. He brought an action in the Supreme Court of the Philippines against the elected members of the Senate [10] and its officers and employees (the President, Secretary, Sergeant at Arms, and Paymaster), seeking a writ of mandamus and an injunction restoring him to his seat and to all the privileges and emoluments of office. The Supreme Court of the Philippines dismissed the action for want of jurisdiction and Alejandrino brought the case here,[11] arguing that the suspension was not authorized by the Philippine Autonomy Act, a statute which incorporated most of the provisions of Article I of the United States Constitution.[12]

---

[10] The Philippines Senate was composed of 24 Senators, 22 of whom were elected, and two of whom were appointed by the Governor General. Alejandrino was one of the two appointees. See 271 U. S., at 531–532.

[11] Under the Philippine Autonomy Act, 39 Stat. 545, this Court had jurisdiction to examine by writ of error the final judgments and decrees of the Supreme Court of the Philippine Islands in cases under the Constitution or statutes of the United States. A subsequent statute substituted the writ of certiorari. 39 Stat. 726.

[12] "Section 18 [of the Autonomy Act] provides that the Senate and House respectively shall be the sole judges of the elections, returns and qualifications of their elective members, and each House may determine the rules of its proceedings, punish its members for disorderly behavior, and with the concurrence of two-thirds expel an elective member. The Senators and Representatives shall receive an annual compensation for their services to be ascertained by law and paid out of the Treasury of the Philippine Islands. Senators and Representatives shall in all cases, except treason, felony and breach of the peace, be privileged from arrest during their attendance at the session of their respective Houses and in going to and returning from the same; and for any speech or debate in either House they shall not be questioned in any other place." 271 U. S., at 532.

Because the period of the suspension had expired while the case was pending on certiorari, a unanimous Court, in an opinion by Chief Justice Taft, vacated the judgment and remanded the case with directions to dismiss it as moot. To Alejandrino's claim that his right to back pay kept the case alive, the Court gave the following answer, which, because of its particular pertinency to this case, I quote at length:

> "It may be suggested, as an objection to our vacating the action of the court below, and directing the dismissal of the petition as having become a moot case, that, while the lapse of time has made unnecessary and futile a writ of mandamus to restore Senator Alejandrino to the Island Senate, there still remains a right on his part to the recovery of his emoluments, which were withheld during his suspension, and that we ought to retain the case for the purpose of determining whether he may not have a mandamus for this purpose. . . . It is difficult for the Court to deal with this feature of the case, which is really only a mere incident to the main question made in the petition and considered in the able and extended brief of counsel for the petitioner, and the only brief before us. That brief is not in any part of it directed to the subject of emoluments, nor does it refer us to any statute or to the rules of the Senate by which the method of paying Senators' salaries is provided, or in a definite way describe the duties of the officer or officers or committee charged with the ministerial function of paying them.

> .    .    .    .    .

> ". . . the remedy of the Senator would seem to be by mandamus to compel such official in the discharge of his ministerial duty to pay him the salary due, and the presence of the Senate as a party would be

unnecessary. Should that official rely upon the resolution of the Senate as a reason for refusing to comply with his duty to pay Senators, the validity of such a defense and the validity of the resolution might become a judicial question affecting the personal right of the complaining Senator, properly to be disposed of in such action, but not requiring the presence of the Senate as a party for its adjudication. The right of the petitioner to his salary does not therefore involve the very serious issue raised in this petition as to the power of the Philippine Supreme Court to compel by mandamus one of the two legislative bodies constituting the legislative branch of the Government to rescind a resolution adopted by it in asserted lawful discipline of one of its members, for disorder and breach of privilege. We think, now that the main question as to the validity of the suspension has become moot, the incidental issue as to the remedy which the suspended Senator may have in recovery of his emoluments, if illegally withheld, should properly be tried in a separate proceeding against an executive officer or officers as described. As we are not able to derive from the petition sufficient information upon which properly to afford such a remedy, we must treat the whole cause as moot and act accordingly. This action on our part of course is without prejudice to a suit by Senator Alejandrino against the proper executive officer or committee by way of mandamus or otherwise to obtain payment of the salary which may have been unlawfully withheld from him." 271 U. S., at 533, 534–535.[13]

---

[13] The petitioners rely on the following passage from *Bond* v. *Floyd*, 385 U. S. 116, 128, n. 4, as dispositive of their contention that the salary claim prevents this case from being moot:

"A question was raised in oral argument as to whether this case might not be moot since the session of the House which excluded

Both of the factors on which the Court relied in *Alejandrino* are present in this case. Indeed, the salary claim is an even more incidental and subordinate aspect of this case than it was of *Alejandrino*.[14] And the availability of effective relief for that claim against any of the present respondents is far from certain. As in *Alejandrino*, the briefs and memoranda submitted by the parties in this case contain virtually no discussion of this question—the only question of remedy remaining in the case. It appears from relevant provisions of law, however, that the Sergeant at Arms of the House—an official newly

---

Bond was no longer in existence. The State has not pressed this argument, and it could not do so, because the State has stipulated that if Bond succeeds on this appeal he will receive back salary for the term from which he was excluded."

I do not believe that this offhand dictum in *Bond* is determinative of the issue of mootness in this case. In the first place, as the Court in *Bond* noted, it was not there contended by any party that the case was moot. Moreover, contrary to the implication of the statement, the legislative term from which Bond was excluded had not ended at the time of the Court's decision. (The Court's decision was announced on December 5, 1966; Bond's term of office expired on December 31, 1966.) In any event, he had not been seated in a subsequent term, so the continuing controversy had not been rendered clearly moot by any action of the Georgia House, as it has here by the House of Representatives of the 91st Congress. No one suggested in *Bond* that the money claim was the only issue left in the case. Furthermore, the considerations which governed the Court's decision in *Alejandrino* were simply not present in *Bond*. Because of the State's stipulation, there was no doubt, as there is here, see *infra*, at 570–571, that the Court's decision would lead to effective relief with respect to Bond's salary claim. And finally, there was no suggestion that Bond had an alternative remedy, as Powell has here, see *infra*, at 571–572, by which he could obtain full relief without requiring the Court to decide novel and delicate constitutional issues.

[14] Alejandrino was the only petitioner in the case, and since he was an appointed Senator, it appears that there was no group of voters who remained without representation of their choice in the Senate during his suspension.

elected by each Congress [15]—is responsible for the retention and disbursement to Congressmen of the funds appropriated for their salaries. These funds are payable from the United States Treasury [16] upon requisitions presented by the Sergeant at Arms, who is entrusted with keeping the books and accounts "for the compensation and mileage of Members." [17] A Congressman who has presented his credentials and taken the oath of office [18] is entitled to be paid monthly on the basis of certificates of the Clerk [19] and Speaker of the House.[20] Powell's prayer for a mandamus and an injunction against the Sergeant at Arms is presumably based on this statutory scheme.

Several important questions remain unanswered, however, on this record. Is the Sergeant at Arms the only necessary defendant? If so, the case is surely moot as to the other respondents, including the House members, and they should be dismissed as parties on that ground rather than after resolution of difficult constitutional questions under the Speech or Debate Clause. But it is far from clear that Powell has an appropriate or adequate remedy against the remaining respondents. For if the Speaker does not issue the requisite certificates and the House does not rescind Resolution No. 278, can the House agents be enjoined to act in direct contravention of the orders of their employers? Moreover, the office of Sergeant at Arms of the 90th Congress has now expired, and the present Sergeant at Arms serves the 91st Congress. If he were made a party in that capacity, would he have the authority—or could the 91st Congress

[15] Act of Oct. 1, 1890, § 6, 26 Stat. 646, 2 U. S. C. § 83.
[16] U. S. Const., Art. I, § 6; 2 U. S. C. § 47.
[17] 2 U. S. C. §§ 80, 78.
[18] 2 U. S. C. § 35.
[19] 2 U. S. C. § 34.
[20] 2 U. S. C. § 48.

confer the authority—to disburse money for a salary owed to a Representative in the previous Congress, particularly one who never took the oath of office? Presumably funds have not been appropriated to the 91st Congress or requisitioned by its Sergeant at Arms for the payment of salaries to members of prior Congresses. Nor is it ascertainable from this record whether money appropriated for Powell's salary by the 90th Congress, if any, remains at the disposal of the current House and its Sergeant at Arms.[21]

There are, then substantial questions as to whether, on his salary claim, Powell could obtain relief against any or all of these respondents. On the other hand, if he was entitled to a salary as a member of the 90th Congress, he has a certain and completely satisfactory remedy in an action for a money judgment against the United States in the Court of Claims.[22] While that court could not have ordered Powell seated or entered a declaratory judgment on the constitutionality of his exclusion,[23] it

---

[21] The respondents allege without contradiction that the Sergeant at Arms does not have sufficient funds to pay Congressman Powell's back salary claims. Separate appropriations for the salaries of Congressmen are made in each fiscal year, see, e. g., 80 Stat. 354, 81 Stat. 127, 82 Stat. 398, and, according to the respondents, "it is the custom of the Sergeant to turn back to the Treasury all unexpended funds at the end of each fiscal year." Thus, the only funds still held by the Sergeant are said to be those appropriated for the present fiscal year commencing July 1, 1968.

[22] "The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress . . . ." 28 U. S. C. § 1491. The district courts have concurrent jurisdiction over such claims only in amounts less than $10,000. 28 U. S. C. § 1346.

[23] *United States* v. *King, ante,* p. 1. The petitioners suggest that the inability of the Court of Claims to grant such relief might make any remedy in that court inadequate. But since Powell's only remaining interest in the case is to collect his salary, a money judgment in the Court of Claims would be just as good as, and probably

is not disputed that the Court of Claims could grant him a money judgment for lost salary on the ground that his discharge from the House violated the Constitution. I would remit Congressman Powell to that remedy, and not simply because of the serious doubts about the availability of the one he now pursues. Even if the mandatory relief sought by Powell is appropriate and could be effective, the Court should insist that the salary claim be litigated in a context that would clearly obviate the need to decide some of the constitutional questions with which the Court grapples today, and might avoid them altogether.[24] In an action in the Court of Claims for a money judgment against the United States, there would be no question concerning the impact of the Speech or Debate Clause on a suit against members of the House of Representatives and their agents, and questions of jurisdiction and justiciability would, if raised at all, be in a vastly different and more conventional form.

In short, dismissal of Powell's action against the legislative branch would not in the slightest prejudice his money claim,[25] and it would avoid the necessity of decid-

---

better than, mandatory relief against the agents of the House. The petitioners also suggest that the Court of Claims would be unable to grant relief because of the pendency of Powell's claim in another court, 28 U. S. C. § 1500, but that would, of course, constitute no obstacle if, as I suggest, the Court should order this action dismissed on grounds of mootness.

[24] It is possible, for example, that the United States in such an action would not deny Powell's entitlement to the salary but would seek to offset that sum against the amounts which Powell was found by the House to have appropriated unlawfully from Government coffers to his own use.

[25] Relying on *Bank of Marin* v. *England,* 385 U. S. 99, 101, the petitioners complain that it would impose undue hardship on Powell to force him to "start all over again" now that he has come this far in the present suit. In view of the Court's remand of this case for further proceedings with respect to Powell's remedy, it is at

ing constitutional issues which, in the petitioners' words, "touch the bedrock of our political system [and] strike at the very heart of representative government." If the fundamental principles restraining courts from unnecessarily or prematurely reaching out to decide grave and perhaps unsettling constitutional questions retain any vitality, see *Ashwander* v. *TVA,* 297 U. S. 288, 346–348 (Brandeis, J., concurring), surely there have been few cases more demanding of their application than this one. And those principles are entitled to special respect in suits, like this suit, for declaratory and injunctive relief, which it is within a court's broad discretion to withhold. "We have cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations." *Public Affairs Press* v. *Rickover,* 369 U. S. 111, 112. "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Eccles* v. *Peoples Bank of Lakewood Village,* 333 U. S. 426, 431.

If this lawsuit is to be prolonged, I would at the very least not reach the merits without ascertaining that a decision can lead to some effective relief. The Court's remand for determination of that question implicitly recognizes that there may be no remaining controversy between petitioner Powell and any of these respondents redressable by a court, and that its opinion today may be wholly advisory. But I see no good reason for any court even to pass on the question of the availability

---

least doubtful that remitting him to an action in the Court of Claims would entail much more cost and delay than will be involved in the present case. And the inconvenience to litigants of further delay or litigation has never been deemed to justify departure from the sound principle, rooted in the Constitution, that important issues of constitutional law should be decided only if necessary and in cases presenting concrete and living controversies.

of relief against any of these respondents. Because the essential purpose of the action against them is no longer attainable and Powell has a fully adequate and far more appropriate remedy for his incidental back-pay claim, I would withhold the discretionary relief prayed for and terminate this lawsuit now. Powell's *claim* for salary may not be dead, but this *case* against all these respondents is truly moot. Accordingly, I would vacate the judgment below and remand the case with directions to dismiss the complaint.